(No. 74002.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT SIMS, Appellant.

*Opinion filed September 21, 1995.—Rehearing denied December 4, 1995.*

488

Charles M. Schiedel, Deputy Defender, and John J. Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Bobby Sims, was convicted of two counts of first degree murder, two counts of armed robbery, two counts of home invasion, and one count of residential burglary. The trial court, sitting as finder of fact, determined that the defendant was eligible for the

death penalty. Following a hearing in aggravation and mitigation, the court found that there were no factors sufficient to preclude imposition of the death penalty and sentenced the defendant to death. The defendant's convictions and sentence have been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).

Upon review, defendant argues that (1) the police lacked probable cause to arrest him; (2) he should have been permitted to testify that he made his inculpatory statements to authorities because the police threatened to "do" him as they had "done" Tony Bey, a co-felon; (3) the trial court should have declared a mistrial because of the prosecutor's use of leading questions during its direct examination of a key State witness, James Jackson; (4) the trial court should have declared a mistrial because the prosecution elicited testimony from a police detective to the effect that an important State witness, Josie Ivy, was afraid of the defendant; (5) the State committed three discovery violations that should have prompted the trial court to declare a mistrial; and (6) the prosecutor made improper remarks during closing argument.

With respect to his sentencing hearing, defendant contends that: (1) the trial court should not have stricken a report from a psychiatrist, Dr. Carl Wahlstrom, which was relied upon by defendant's mitigation specialist, John Sturman, in his testimony at the sentencing hearing; (2) the trial court should have appointed substitute counsel to represent defendant with regard to his allegation that his sentencing attorney was ineffective; (3) the trial court should have excluded evidence at the sentencing hearing that indicated defendant belonged to a gang while serving a term of imprisonment for a previous felony conviction; (4) the defendant's 1975 murder conviction could not be used to

render him eligible for the death penalty; (5) one of defendant's home invasion convictions should be vacated, thereby necessitating a new sentencing hearing; and (6) the Illinois death penalty statute is unconstitutional.

## Background

Defendant was convicted for the November 1988 murders and armed robberies of William Brown and Robert Nelson, who lived in neighboring apartments in the 3400 west block of 12th Place in Chicago. Officers of the Chicago police department found the bodies of the victims in Robert Nelson's apartment on November 21, 1988. The apartment had been ransacked and it appeared that some items had been taken from the residence.

Forensic evidence established that victim William Brown died from multiple stab wounds. Robert Nelson died from craniocerebral injuries due to blunt trauma and a stab wound to the chest. Robert Nelson's son, Randall Williams, informed authorities that he had seen his father the previous morning, on November 20, 1988. Randall also advised that he had attempted to speak to his father on the evening of November 20, but found no one in his father's apartment. The next morning, Randall received a telephone call from his aunt and returned to his father's apartment. Randall looked through a window at the back entrance and saw a body on the floor. Randall told his aunt to call the police. The police came and broke in the door to his father's apartment, where they found Randall's father, Robert Nelson, and William Brown. Both men were dead.

Police authorities conducted fingerprint examinations of various objects in the apartment. It was determined that three objects on the kitchen table contained fingerprints suitable for comparison: a large grapefruit juice bottle, a wine cooler bottle, and a drink-

ing glass. Comparisons were made of these fingerprints and it was ascertained that the prints taken from the wine cooler bottle and the drinking glass belonged to one of the victims, Robert Nelson. It was further determined that the fingerprints found on the grapefruit juice bottle belonged to the defendant.

Police authorities uncovered significant evidence linking defendant to the homicides. Josie Ivy, defendant's girlfriend, testified that on the date of the murder, defendant left her apartment in the company of a friend, Tony Bey, at approximately 5 p.m. Defendant returned to the apartment sometime later that night, at approximately 9 or 10 p.m. Josie testified that defendant told her that Tony "had hurt some people." Defendant repeatedly told Josie that he himself had knocked someone out using a brick and that Tony had stabbed the other man. Defendant also told her that Tony went over to the man whom defendant had knocked out and stabbed this victim, in order to "finish the job." Later, defendant told Josie that Tony had taken a VCR from the apartment where the two men had been killed.

Pursuant to defendant's instructions, Josie telephoned her brother, Lee Ivy, and arranged for Lee to have the VCR. When Lee arrived at Josie's apartment to take the VCR, defendant gave Lee two BB guns. Lee drove defendant and Josie to the home of defendant's nephew, James Jackson. Josie stated that she heard the defendant ask his nephew if the police had been looking for him. When defendant's nephew asked defendant what had happened, the defendant said, "It's in the papers; read the paper."

James Jackson, defendant's nephew, testified that defendant came to his house on November 23, 1988. Defendant said that he may be in some trouble and that the police were looking for him. He told James that some people may have got killed at a house on 12th

Place in Chicago where one of James' uncles used to live. Defendant said that the people were stabbed and that a brick had also been used. Defendant also said that his fingerprints may be found in the apartment on a bottle. According to James, defendant said that the incident "may be in the paper" and suggested that the nephew "buy a paper."

Josie's brother Lee Ivy also gave testimony regarding his encounter with defendant and Josie on November 23, 1988. Lee stated that when he arrived at Josie's apartment, defendant said that he wanted to leave town and appeared nervous. Lee's testimony regarding defendant's offer of BB guns and a VCR was substantially similar to the account given by Josie. Lee also gave substantially similar testimony regarding their trip to the home of defendant's nephew, James Jackson.

The State also presented testimony to establish that defendant had confessed to his participation in the murders. Detective Ralph Vucko of the Chicago police department testified that officers arrested defendant on December 21, 1988. Thereafter, defendant was transported to the police station and placed in an interview room. Detective Vucko testified that defendant was not placed in handcuffs while he was held in the interview room. He advised defendant of his *Miranda* rights and defendant agreed to speak to the detective. Initially, defendant denied any involvement in the incident. Detective Vucko responded that the police had talked to several people in the investigation, including Tony Bey, Rodney Ivy, Josie Ivy, and James Jackson. Defendant then said that he was lying and that he would tell the truth.

According to Detective Vucko, defendant told him that on November 21, 1988, defendant was at Josie's apartment when Tony Bey came over. Defendant went outside with Tony and they walked around. Tony said

that he needed some money and suggested that they go over to Robert Nelson's house. As they were walking, they were joined by Rodney Ivy and the three went to victim Nelson's apartment.

When they arrived at the apartment building where Nelson lived, Rodney stayed outside while defendant and Tony knocked on the front door. Nelson greeted them at the front door and let them into the apartment. They went into the kitchen. Tony asked for something to drink and Nelson produced a bottle of gin and some glasses. He also got some orange juice from the refrigerator. While they were in the kitchen, William Brown came in and joined them. The group had a conversation. Tony asked for a cigarette, but Brown said he did not have any. Brown gave Tony a $20 bill to buy some cigarettes. Defendant told Nelson that he was hungry and wanted some food. Nelson gave defendant $5 for something to eat. Defendant and Tony left the apartment together and joined Rodney outside.

While defendant, Rodney, and Tony were walking around the area, Tony suggested that they should buy some knives instead of some food. They went to a grocery store and Tony bought a kitchen knife. They walked back toward Nelson's apartment and Tony said to defendant, "You do your part, and I'll do mine." Defendant picked up a brick that was on the ground and put it in his coat pocket. They walked back to Nelson's apartment. Rodney waited outside while Tony and defendant knocked on the door.

William Brown opened the door and defendant walked past him, through the apartment and into the kitchen where Nelson was seated at the table. Defendant heard a commotion in the front and heard Brown calling out to Nelson. Defendant took the brick out of his pocket and hit Nelson two or three times on the head. Nelson fell to the ground and began moaning. De-

fendant went into the bedroom to look for a pistol that he knew was in the room. As he was searching for the pistol, Tony appeared at the doorway. Tony told defendant that Nelson was still alive and that he "would take care of him." Tony then went into the kitchen area. A short time later, defendant no longer heard Nelson moaning.

Defendant continued to search through the bedroom. The telephone began to ring and defendant became scared and started to walk through the apartment. He saw Tony taking items from the apartment and putting them in a small suitcase. He also saw Tony take a VCR and put it in a box. They both walked out of the apartment together. Tony gave defendant the suitcase to carry and Tony carried the cardboard box with the VCR. When they got outside, they were joined by Rodney Ivy, and walked back to Josie's apartment.

When they arrived at Josie's apartment, Tony said that he had taken $20 from the victims and gave the defendant $12. Tony also told defendant to take what he wanted from the suitcase. Defendant took from the suitcase what he believed were two guns. Tony told him that he would sell the VCR later, and told defendant that he had better go home because he was "full of blood." Defendant and Rodney went back to Josie's apartment. As they were walking, defendant realized that the guns he had taken were BB guns. He gave them to Rodney along with $2.

Detective Vucko denied that he struck or kicked defendant during his interrogation, and denied that he made any threats to the defendant. The detective testified that defendant was given food and drink. He further stated that the defendant never asked to talk on the telephone and never said he had been beaten.

Assistant State's Attorney Robert Chapman Buckley, Jr., testified regarding the conversations he had

with defendant after defendant was placed under arrest and brought to the police station on December 21, 1988. His testimony was substantially similar to the testimony given by Detective Vucko. Assistant State's Attorney Buckley testified that after his initial conversation with the defendant, defendant agreed to a handwritten statement of what had transpired. Assistant State's Attorney Buckley left the room and wrote out the statement that defendant had given him.

The defendant, Detective Vucko, and Assistant State's Attorney Buckley then reviewed the defendant's statement. At the conclusion of reading the entire statement, defendant signed the bottom of each page of the statement. Defendant also signed his name after the portion that set out the *Miranda* rights. Detective Vucko and Assistant State's Attorney Buckley also signed the statement. The handwritten statement recounted the events surrounding the murders in substantially the same fashion as the account defendant gave to Detective Vucko.

Defendant said in his statement that no one promised him anything, forced him, or threatened him to make his statement. He also said that the police and assistant State's Attorney had treated him well. Defendant further stated that he was not under the influence of alcohol or drugs and that he had given the statement freely and voluntarily. Assistant State's Attorney Buckley testified that when he took the statement from defendant, he did not see any injury to defendant's face, head, eyes or mouth.

Defendant testified in his own defense at trial. He stated that in November 1988, he had known Josie for about four or five months. Defendant testified that he was employed to do general handyman work, such as plumbing and electrical repairs. Defendant knew Tony Bey from seeing him in the neighborhood. He knew Rob-

ert Nelson because defendant's brother had stayed with Nelson for a couple of months.

Defendant said that he met Nelson one day through his brother in 1987 or 1988 and that he had been over to Nelson's house only four times. In November 1988, he did some plumbing work for Nelson, in approximately the second or third week of November. Defendant stated that he had some juice to drink after he was finished working at Nelson's apartment. Defendant stated that he never borrowed any money from Nelson.

Defendant testified that on December 21, 1988, at approximately 11 p.m., he was arrested by officers of the Chicago police department and transported to the police station. Defendant stated that when they arrived at the station house, he was placed in an interview room and handcuffed to a ring on the wall. After approximately 20 minutes, Detective Vucko entered the room. According to defendant, Detective Vucko said, "You are going to tell me about the sissies that were killed." Defendant responded that he did not know anything about it. Detective Vucko answered that defendant was lying because Josie "had told him." Defendant repeated that he did not know anything about the murders.

Defendant testified that Detective Vucko repeatedly struck the defendant in the face, saying that defendant was lying and that defendant knew about the homicides. Defendant continued to deny any involvement in or knowledge of the incident. According to defendant, Detective Vucko then assaulted the defendant. Defendant testified that he sustained injuries to his leg, ribs, mouth, face and eyes. Defendant testified that thereafter, Detective Vucko said, "We are going to do you like we did Tony Bey." Because of this remark, defendant became afraid. Detective Vucko started "hollering" and telling defendant what he had done during the incident. Defendant denied that he knew anything, but Detective Vucko repeated his accusations.

Defendant stated that a short time later, the detective briefly left the room. Detective Vucko then returned with a written statement he had drawn up. The detective sat in front of the defendant and read over the statement, asking if it correctly stated what had transpired. Defendant answered yes because he was afraid that the detective would continue to beat him if he did not agree.

An assistant State's Attorney entered the room. Detective Vucko again read the statement that he had written for defendant, and again defendant agreed that the statement gave an accurate account of what had happened. Later, the assistant State's Attorney returned by himself with another written statement that he had prepared. The assistant State's Attorney gave it to defendant to read. The defendant read part of it and then pushed it back to the assistant State's Attorney. The attorney asked defendant if he wanted to sign it. Defendant testified that he refused, because "it wasn't true." Defendant asked the assistant State's Attorney, "[I]f I don't sign it, would the police beat me anymore," and the assistant State's Attorney responded, "[T]he best thing [I] can do is tell [you] to sign it." Defendant testified that he then signed the statement, because he was afraid.

Defendant said that before he signed the statement, he had not been given any food or water and that no one advised him of his *Miranda* rights. After he signed the statement, the assistant State's Attorney left the room. Defendant was taken to lockup, where he was allowed to use a phone. He called his sister, Eloise Cole, and told her that he had been beaten by the police and that they made him sign a statement. Defendant represented that he continued to have sharp pain in the chest area every time he breathed.

In his trial testimony, defendant denied that he went to see Josie the evening of November 21, 1988, and

stated that he did not go to Nelson's house with either Tony or Rodney. Defendant denied any involvement in the double homicides at Nelson's apartment. He also denied offering to sell Lee Ivy a VCR, or telling his nephew, James Jackson, that he had killed two people.

It was stipulated that defendant was found guilty of two felonies in 1975 and that judgment was entered on those convictions.

Eloise Cole, defendant's sister, testified that defendant telephoned her on the evening of December 22, 1988, and told her that the police had locked him up for murder. Defendant also said the police had beaten him and that they refused to take him to the doctor. Eloise testified that she went to court the following day and saw the defendant. Eloise stated that the defendant looked "horrible" and appeared to be sick.

Eloise also testified that defendant came over to her house on November 23, 1988, and he asked if her son, James Jackson, was at home. Eloise denied that she told detectives, when they talked to her on November 30, that defendant also asked if the police were looking for him.

In the State's case in rebuttal, Detective Boock testified that he interviewed Eloise Cole on November 30, 1988. According to the detective, Eloise told him that on November 23, 1988, defendant arrived at her house and told her that the police might be looking for him. Eloise also told the detective that when defendant left the home, her son, James, was with the defendant.

Howard Hradek, a paramedic supervisor at Cermak Hospital, testified that according to hospital records, the first time that defendant spoke to hospital personnel was on December 30, 1988. At that time, he complained of chest pains. The following day, defendant talked to hospital personnel and complained of rib pain. Defendant never complained about a leg injury or a face, mouth, or head injury.

Based upon this evidence, the jury found defendant guilty of the first degree murders of William Brown and Robert Nelson, the home invasion of both victims, the armed robberies of both victims, and the residential burglary of Nelson's apartment.

The defendant elected to waive a jury for his sentencing hearing. Following evidence and argument, the trial court determined that the defendant was eligible for the death penalty (see 720 ILCS 5/9—1(b)(3), (b)(6) (West 1992)). The defendant waived a jury for the aggravation/mitigation phase of the sentencing hearing, and the evidence submitted by the parties was considered by the trial court sitting as finder of fact. The evidence offered in aggravation and mitigation is set forth below with respect to sentencing issues raised by defendant in this appeal.

## I

Defendant argues that the police lacked probable cause to arrest him. The record shows that defendant, Tony Bey, and Rodney Ivy were jointly indicted for the offenses related to the deaths of Nelson and Brown. The trial court held various pretrial hearings with respect to motions filed by defendant, Tony Bey, and Rodney Ivy. The hearing on defendant's motion to quash his arrest was held concurrently with a hearing on Bey's motion to suppress his statements to authorities.

At the end of these hearings, the trial court determined that the police had probable cause to arrest the defendant. The court noted that the statements made by Tony Bey and Rodney Ivy, both of which implicated the defendant, were sufficient to provide the police with probable cause to arrest the defendant. The court then considered Bey's motion to suppress his statements to authorities and concluded that Bey's statements were the product of police coercion and should be suppressed from Bey's trial for his participation in the double homicides.

In light of the trial court's rulings with respect to the involuntariness and suppression of Bey's statements, defendant claims that the police did not have probable cause to arrest him for the homicides. Relying on *People v. Bates* (1991), 218 Ill. App. 3d 288, defendant argues that the coerced statements of one participant to a felony cannot be used to establish probable cause to arrest a co-felon. Defendant also claims that the statement by Ivy could not form the basis for probable cause, inasmuch as Ivy was later acquitted in a separate bench trial.

It is well established that the police may arrest a person suspected of having committed a felony provided there is probable cause for the arrest. (*People v. Edwards* (1991), 144 Ill. 2d 108, 127.) Probable cause is defined as reasonable ground to believe that the suspect has committed, or is committing, a felony. (*People v. Williams* (1991), 147 Ill. 2d 173, 209; *People v. Montgomery* (1986), 112 Ill. 2d 517, 525; *People v. Neal* (1985), 111 Ill. 2d 180, 193; 725 ILCS 5/107—2 (West 1992).) Probable cause to arrest is a nontechnical concept determined according to the totality of the circumstances confronting the officers at the time of the arrest. *Edwards*, 144 Ill. 2d at 128; *People v. Foskey* (1990), 136 Ill. 2d 66, 76.

In determining whether the trial court correctly found probable cause to arrest the accused, a reviewing court is not limited to the evidence presented at the circuit court's pretrial suppression hearing, but may also consider evidence that was offered at the defendant's trial. (*People v. Patterson* (1992), 154 Ill. 2d 414, 450; *People v. Melock* (1992), 149 Ill. 2d 423, 433, citing *People v. Caballero* (1984), 102 Ill. 2d 23, 36.) Also, this court may affirm a trial court's suppression ruling for any reason appearing in the record, regardless of whether such reason was expressly noted by the trial

court in reaching its conclusion. *People v. Everette* (1990), 141 Ill. 2d 147, 158-59.

We need not address the defendant's argument that the police could not rely upon the statements of Tony Bey and Rodney Ivy in order to find probable cause to arrest defendant. In addition to the statements of Tony and Rodney, the police had additional information that justified defendant's arrest. Josie Ivy testified that prior to the defendant's arrest, she informed authorities of the defendant's statement to her regarding the double homicides. According to Josie's trial testimony, defendant said that he and Tony had killed two persons on November 22, 1988. He told Josie that he had hit a man and that Tony had stabbed a second individual. Defendant also told Josie that they had taken various items from the apartment, including a VCR.

In addition to Josie's statements to authorities, James Jackson, defendant's nephew, testified that on November 30, 1988, he advised officers that he had a conversation with the defendant a week earlier, on November 23. In this conversation, defendant told James that defendant believed the police were looking for him because he was in trouble and had been involved in a double homicide. Defendant said that the murders occurred in an apartment where his brother, James' uncle, used to live. Defendant related to James that one victim had been stabbed and another victim hit with a brick. Defendant said that he was afraid that his fingerprints would be found at the scene of the murders.

The defendant claims that Josie Ivy's statements were not reliable because she engaged in drug and alcohol use and because she was motivated to inculpate the defendant in order to exonerate her son, Rodney, who also was arrested in connection with the murders. Defendant also contends that James Jackson's statements were untrustworthy because James engaged in

drug use that caused him to suffer from delusions and hallucinations for which he was undergoing medical treatment.

However, evidence at the scene of the murders corroborated the accounts given by James Jackson and Josie Ivy. When authorities entered Nelson's apartment, they discovered that both victims had been killed. One victim had been stabbed, while the other had been hit over the head with a blunt object. Investigation revealed that defendant's brother had once lived with Nelson. The authorities learned from victim Nelson's son that a VCR had been taken from the residence. We find that the statements to authorities that were given by Josie Ivy and James Jackson were sufficiently corroborated by the condition of the scene of the murders to render their statements reliable. In light of these circumstances, the record shows that the police had probable cause to arrest the defendant. As a result, the record supports the trial court's determination of probable cause, as well as the trial court's denial of defendant's motion to quash his arrest.

## II

Defendant contends that he should have been permitted to testify that he had made his inculpatory statements because the police threatened to beat him as they had beaten Tony Bey.

Initially, we note that the record refutes defendant's claim that he was not permitted to testify to the statement he attributed to Detective Vucko in this regard. The record reflects that on direct examination, defendant testified that Detective Vucko said to defendant, "We are going to do you like we did Tony Bey." The prosecution objected to this comment. At a sidebar outside the presence of the jury, the trial court overruled the State's objection to the defendant's statement as quoted above.

During the sidebar, defense counsel additionally represented that he wanted to offer evidence of defendant's knowledge of the *specific circumstances* involving Tony Bey's interrogation. Counsel stated that this additional testimony should be admissible to show defendant's state of mind, in that the defendant felt threatened by the officer. The trial court sustained the prosecution's objection to such additional questioning of defendant regarding the circumstances surrounding the authorities' interrogation of Tony Bey.

The trial court then resumed the proceeding in the presence of the jury. Before examination of the defendant was resumed, the judge stated that the prosecutor's objection was sustained. Defense counsel then recommenced its examination of the defendant.

The defendant argues that the trial court sustained the prosecutor's objection to defendant's testimony that Detective Vucko said, "We are going to do you like we did Tony Bey." However, in the context of the court's proceedings, it is apparent that the court's ruling, in which the court sustained the State's objection, pertained to the prosecutor's second objection to defense counsel's questioning of defendant regarding the specific details of police officers' beating of Tony Bey. There is nothing in the record to suggest that the court excluded from the jury's consideration defendant's testimony that Detective Vucko had threatened the defendant. Based upon our review of the record, we find that the trial court permitted the jury to consider defendant's testimony in this regard.

We further find no reversible error in the trial court's determination that defendant should not be permitted to testify to his understanding of the details surrounding the officers' mistreatment of Tony Bey. Even if we assume *arguendo* that the court's ruling was incorrect, the overwhelming evidence of the defendant's

guilt renders such error an inadequate ground to warrant a new trial. The evidence in the present case revealed that defendant told at least two individuals, his nephew, James Jackson, and his girlfriend, Josie Ivy, that he had been involved in the murders of William Brown and Robert Nelson and gave specific details as to where, when and how the murders occurred. Information and evidence discovered by authorities corroborated the accounts given by defendant to James and Josie. For example, defendant's fingerprints were found at the scene of the crime. Defendant's brother had once lived in the apartment with Nelson, one of the victims. Items that were taken from the residence were traced to the defendant. Given all of this evidence, we do not believe that the defendant's testimony to the specific circumstances of Tony Bey's mistreatment by authorities would have altered the verdicts returned against the defendant by the jury in the instant cause.

Defendant also contends that he should have been allowed to testify that he signed an allegedly incriminating affidavit because Tony Bey forced him to do so. The record indicates that while defendant was held in jail pending trial, he executed an affidavit wherein he stated that Josie Ivy and Edward Powell were at "the party at the time the deceased was supposedly killed." Defendant now claims that his attorney should have been permitted to ask him questions at trial to show that he executed the affidavit because he feared Tony Bey.

We need not reach the question of whether the trial court abused its discretion when it denied defense counsel's request to examine the defendant regarding his fear of Tony Bey as a reason for defendant's execution of the affidavit. As noted above, the overwhelming evidence of the defendant's guilt leads us to conclude that the trial court's ruling did not amount to reversible error.

## III

The defendant contends that the trial court erred when it refused to grant him a mistrial on the ground that the State allegedly posed numerous leading questions during its direct examination of James Jackson. Defendant argues that he was so prejudiced by the leading questions asked by the State that the trial court should have declared a mistrial or stricken James Jackson's testimony from the record.

Generally, a mistrial should be awarded where there has been an error of such gravity that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice. (*People v. Redd* (1990), 135 Ill. 2d 252, 323; see *People v. Camden* (1991), 219 Ill. App. 3d 124, 135.) The trial court's denial of a defendant's request for mistrial will not be disturbed unless the trial court's decision was a clear abuse of discretion. *People v. Hall* (1986), 114 Ill. 2d 376, 405.

We find no abuse of discretion in the trial court's refusal to grant the defendant a mistrial. The record does not support the conclusion that the State's use of leading questions during its examination of James Jackson was an error of such magnitude that it deprived the defendant of a fundamentally fair trial. The trial court sustained an objection each time one was interposed by defendant with regard to the State's use of leading questions to examine James Jackson. Following the court's ruling, the State rephrased its questions so that they were not leading. Moreover, the record reveals that the State believed its manner of examination was necessitated by the poor ventilation in the room, making it difficult for the prosecution to hear the answers stated by the witness. The trial court acknowledged this circumstance when it directed that the witness be moved away from the source of the noise in the room. We find it significant that the defense was permitted full latitude

in cross-examining the witness regarding his recollection of his conversation with the defendant, as well as other matters that might bear on the witness' credibility.

In view of all of these circumstances, we conclude that the State's use of leading questions in this case was not a trial practice that deprived the defendant of a fundamentally fair trial, and that defendant's argument on this issue is an inadequate basis to award him a new trial. We note that none of the cases cited by defendant support his position. See *People v. Cobb* (1989), 186 Ill. App. 3d 898; *People v. Pirrello* (1988), 166 Ill. App. 3d 614; *People v. Luigs* (1981), 96 Ill. App. 3d 700.

### IV

Defendant asserts that the trial court committed reversible error when it refused to grant him a mistrial because the State asked Detective Summerville whether Josie Ivy had told the detective that she was afraid of the defendant.

We note that we need not decide whether the evidence of Josie's fear of the defendant would have been properly admissible at trial. The trial court sustained the defendant's objection to the question posed by the prosecution, and the jury was never permitted to hear an answer to the question.

With respect to defendant's request for a mistrial, we can find no abuse of discretion in the trial court's denial of defense counsel's mistrial motion. The record reveals that the defendant was not so prejudiced by the State's question to the witness that it deprived the defendant of a fundamentally fair trial. The record in the present case reveals that the outcome of defendant's trial likely would not have been altered if the State had refrained from asking Detective Summerville whether Josie Ivy had said she was afraid of the defendant. Defendant's oral and written confessions were cor-

roborated by the statements of James Jackson, Josie Ivy and Lee Ivy. In addition, defendant's account was confirmed by physical evidence recovered from the crime scene. The evidence of defendant's guilt far outweighed any prejudice that may have arisen from the State's question to Detective Summerville. As a result, we conclude that the State's allegedly improper question posed to Detective Summerville was not of a character to deprive the defendant of a fundamentally fair trial.

V

Defendant contends that the State committed three discovery violations, revealed during the course of trial, for which the trial court should have granted the defendant's motion for a mistrial. According to the defendant, the State's failure to produce the information before trial violated the directives of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

In *Brady*, the Supreme Court held that a prosecutor violates the due process rights of the accused when the State, notwithstanding a specific defense request for production of evidence, fails to disclose evidence that is material to the suspect's guilt or innocence. (See also *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392; *California v. Trombetta* (1984), 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528; *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333.) Evidence is material when it would tend to raise a reasonable doubt of the defendant's guilt. The pertinent inquiry is not whether the evidence might have helped the defense, but whether it is reasonably likely that it would have affected the outcome of the case. (*E.g., People v. Foggy* (1988), 121 Ill. 2d 337, 354; *People v. Flores* (1989), 128 Ill. 2d 66, 91-92.) Applying these principles to the defendant's arguments in this case, we find that the State's alleged *Brady* violations did not pertain to material evidence that would have affected the outcome of defendant's trial.

The first alleged discovery violation pertained to the criminal record and history of drug use of Randall Williams. Randall, the son of victim Robert Nelson, testified on behalf of the State at defendant's trial. The defendant learned during trial that Randall had a criminal record and a history of drug use. Defense counsel complained to the circuit court that this evidence should have been produced by the State before trial began. In response to this complaint, the prosecutors maintained that they were unaware of Randall's criminal background or use of narcotics. Defense counsel was permitted to undertake a *voir dire* of Randall regarding these matters before Randall gave his cross-examination testimony before the jury.

We need not decide whether the State violated the directives of *Brady* with respect to the evidence that Randall had a criminal background and a history of drug use. Our review of the record demonstrates that the defendant was not so prejudiced that he should have been awarded a mistrial. The trial court ensured that the defense was provided ample opportunity to cross-examine Randall regarding these matters, thereby preserving the defendant's argument that Randall's testimony should be disbelieved because of this witness' extensive criminal background and history of drug abuse. There is nothing in the record to indicate that the defense would have questioned Randall differently, or presented different or additional argument to the jury, if the defendant had been made aware, prior to trial, of Randall's criminal record and history of drug abuse.

The defendant's second allegation of discovery violation involves the State's asserted failure to reveal the results of tests to determine whether a stain found on Randall's coat contained evidence of blood.

We find no reversible error with regard to the trial

court's denial of defendant's mistrial motion based upon the State's lack of disclosure of the results of police testing of the stain found on Randall's coat. The record does not establish that the police lab test result regarding the stain was material to a determination of the defendant's guilt. According to the record, the lab result indicated that the stain on Randall's coat was not a blood stain. As noted, evidence is material " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*People v. Olinger* (1986), 112 Ill. 2d 324, 342, quoting *United States v. Bagley* (1985), 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383.) Based upon our review of the record, which reveals the overwhelming evidence against the defendant, we do not believe that the outcome of the defendant's trial would have been different if the defense had learned at an earlier date that the stain on Randall's coat did not contain blood.

The last instance of alleged discovery violation pertains to the hat found by authorities at Nelson's apartment when the homicides were discovered. Detective Boock testified that he recovered a hat near Nelson's body. The police were not able to ascertain who owned the hat. The detective testified that the hat was submitted for blood and hair/fiber testing. Although the defense had received a copy of the serology report, the hair/fiber test results were never received by the defendant.

The defendant argues that the State's failure to disclose lab results for the hair and fiber found on the hat recovered from the scene amounted to a violation of *Brady*. We find no reversible error. The record indicates that the prosecutors were unaware that there had been a microscopic examination of hair and fibers on the hat. The trial court suggested that the defense question the

appropriate witnesses to reveal the State's failure to pursue this area of the investigation, but the defense declined this invitation. Samples were taken from the defendant and the Randall brothers in order to determine whether their hair matched the hair found on the hat. However, the results of this testing are not contained in the record and therefore do not aid in the defendant's defense. In light of the substantial evidence of the defendant's guilt, as set forth in the record, we do not believe that a more timely disclosure of this information would have affected the outcome of the defendant's trial.

We also consider, and reject, defendant's claim that the prosecutors in the instant cause were acting in bad faith when they failed to disclose the matters challenged by the defendant. (See *Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333.) The trial court made specific remarks that bear directly on this issue. The court commented that it was "clear retrospectively that the State was clearly not prepared to proceed when they proceeded." The court "retract[ed]" its earlier suggestion that "there may have been something intentionally done by [the assistant State's Attorneys]." There is nothing in the record to contradict the trial court's ultimate determination with respect to its finding that the prosecutors here were not acting in bad faith.

Defendant argues that his prosecution violated principles of double jeopardy, relying upon the rule that double jeopardy concerns arise where the prosecution has engaged in intentional misconduct that provoked the defendant to request a mistrial. (See, *e.g.*, *Oregon v. Kennedy* (1982), 456 U.S. 667, 72 L. Ed. 2d 416, 102 S. Ct. 2083; see also *People v. Ortiz* (1992), 151 Ill. 2d 1.) Defendant contends that the State's *Brady* violations were intentional and were designed to provoke defendant into requesting a mistrial. However, the record

discloses that the State did not violate *Brady*. The trial court found that the prosecutors' actions did not, in any event, amount to intentional misconduct.

In light of these considerations, we find defendant's *Brady* arguments inadequate to justify a new trial.

## VI

Defendant argues that reversible error resulted from a statement made by the prosecutor during closing argument. Specifically, defendant challenges the following remarks made by the assistant State's Attorney:

"You heard from Randall Williams. [He] told you how [he] lost a family member. You heard from George Williams. George and Randall are brothers. You heard how they lost their father and you heard that they were bad guys. The defense told you over and over and over how bad they are.

Did Robert Nelson deserve to die because two of his children were not what one would hope for? What about his other four children? The defense did not call his other four children to the stand."

Defendant's attorney objected to these remarks. The trial court sustained the objection and instructed the jury to disregard the comment. The trial court advised the jury that the "defense has no obligation to produce any evidence if it does not wish to."

Defendant contends that the State's comments were improper. Defendant notes that this court has held objectionable prosecution remarks that direct the jury's attention to surviving family members, on the ground that the jury may be influenced by the consideration that the deceased left behind family. (See *People v. Hope* (1986), 116 Ill. 2d 265; *People v. Bernette* (1964), 30 Ill. 2d 359.) Defendant asserts that the State's comments also violated the rule that the prosecutor cannot comment upon the defendant's failure to call a witness (see, *e.g.*, *People v. Beller* (1979), 74 Ill. 2d 514). Defendant contends that the remarks here served to prejudice the

jurors against him, by arousing their sympathy for the victim, Robert Nelson, and his children.

Defendant's argument neglects the fact that the trial court sustained his objection to the prosecutor's remarks and directed the jury to disregard the comment. It is well established that the trial court's decision to sustain a defense objection, and the trial court's instruction to the jury to disregard the remark, will cure any prejudicial impact from the prosecutor's improper remark. (*People v. Tenner* (1993), 157 Ill. 2d 341, 384.) We find that the trial court's actions in the present cause served to obviate any prejudice to the defendant that might have been caused by the assistant State's Attorney's remarks. As a result, we conclude that defendant's argument on this point is insufficient basis to award him a new trial.

### Background for Sentencing Issues

In the aggravation/mitigation phase of the sentencing hearing, the State introduced evidence to show that defendant participated in an armed robbery/murder that had occurred in Chicago in November 1975. Defendant pleaded guilty to the charges and was sentenced to 25 to 50 years for murder and 25 to 50 years for attempted armed robbery, each sentence to be served concurrently. Defendant was imprisoned from November 1976 to September 1985. Defendant did not complain of any psychiatric problems or any psychological trauma or ailment.

Cameron Forbes, a record officer supervisor at Joliet Correctional Center, testified that he reviewed defendant's penitentiary records for the period that defendant was imprisoned for his 1975 conviction. He stated that while the defendant was incarcerated, defendant was a member of the Black Gangster Disciples street gang. Inmate records indicated that defendant had four major infractions and numerous minor infractions. De-

fendant was periodically found to have unauthorized items in his cell, including pieces of metal that could be used as weapons, and items representing membership in a gang. During the hearing it was also established that defendant completed his GED while he was in prison, and that it was indicated, on various reports, that defendant's behavior was "excellent." After presenting this evidence, the State rested its case.

John David Sturman, a mitigation specialist and assistant director of the Alternative Sentencing Project, testified in defendant's behalf. Sturman reviewed defendant's police reports, prison records, and various documents relating to his educational and employment history. Sturman also interviewed defendant's family and friends, spoke to prison personnel who were acquainted with the defendant, and met with the defendant. In addition, Sturman retained the services of Dr. Carl Wahlstrom, an attending psychiatrist at Rush-Presbyterian-St. Lukes Medical Center. Sturman stated that he relied upon Dr. Wahlstrom's report in reaching his conclusions.

Sturman testified that he made certain findings significant to defendant's case. The first was that defendant was born into poverty and extreme deprivation. Sturman related that this deprivation pertained not only to a lack of material belongings, but also involved a lack of close positive significant peer relationships. Defendant's mother was very hard working, but his father was always absent. Sturman stated that defendant was left to fend for himself and was raised by another child in the family. As a result, defendant did not have a significant adult male role model or a parental model.

As a second finding, Sturman noted that defendant was largely self-taught in terms of his adaptive and coping mechanisms. Sturman explained that defendant's

life was difficult while he was growing up in Mississippi. When defendant and his family moved to Chicago, defendant encountered additional difficulties. Defendant was victimized by gangs and was assaulted. He developed an avoidance pattern of behavior, so that he could head off victimization and violence and survive without further victimization. The adaptive and coping skills that he learned in his youth were employed in Chicago in ways that were not self-fulfilling or positive. As a result, during his adolescence, defendant became involved in destructive behavior.

Sturman found it significant that the defendant made educational achievements while he was in prison and noted that defendant had adapted in a positive manner while imprisoned. Based upon his investigation, experience and training, Sturman recommended that defendant not be sentenced to death. On cross-examination, Sturman acknowledged that he did not believe in the death penalty.

Members of defendant's family, including his mother and several of his siblings, testified to defendant's troubled childhood and their love and affection for the defendant. In rebuttal, the State elicited the testimony of Pearl Williams, the daughter of victim Robert Nelson. Pearl recounted to the court the economic and personal hardships that her family suffered from Nelson's death.

The trial court sentenced the defendant to death, finding no mitigating factors sufficient to preclude imposition of this sentence.

I

The defendant argues that the trial court erred when it ruled inadmissible the substance of Dr. Wahlstrom's report of his interview with the defendant wherein the psychiatrist gave his opinion regarding defendant's psychiatric condition.

Dr. Wahlstrom's report was referred to and relied upon by Sturman, defendant's mitigation specialist, in Sturman's testimony and opinion regarding the mitigating factors that weighed against imposing the death penalty for defendant's convictions. According to Sturman, Dr. Wahlstrom's report indicated that defendant suffered from substance abuse (cocaine and PCP). The report also revealed that defendant suffered from post-traumatic stress syndrome that had been brought on by an attack while defendant was imprisoned for his 1975 murder conviction. Dr. Wahlstrom's report of his interview stated that defendant's substance abuse was in complete remission, and that his suffering from post-traumatic stress syndrome was in partial remission. Dr. Wahlstrom represented that the prognosis with regard to the post-traumatic stress syndrome was very good if defendant were serious about treatment.

The record reflects that during defense counsel's closing argument to the court, the trial court pointed out to the defendant's attorney that Dr. Wahlstrom's report made no mention of whether defendant was suffering from a mental disability at the time he committed the offenses at the Nelson apartment. Counsel offered to call Dr. Wahlstrom to the stand to give his opinion with respect to this issue, and the trial court granted the defense a continuance in order to present Dr. Wahlstrom to testify.

When the court reconvened, the State advised the trial court that it had interviewed Dr. Wahlstrom and discovered that the doctor would, if cross-examined, testify to statements made by the defendant to the doctor. The State represented that these remarks would be damaging to the defendant. Defense counsel stated that he had conferred with the defendant and that the defendant had nevertheless chosen to call Dr. Wahlstrom to testify at the hearing. The trial court undertook *voir*

*dire* of the defendant, questioning whether the defendant wanted Dr. Wahlstrom to testify in his behalf. After this questioning, the defendant indicated to the court that he had changed his mind and that he no longer wanted Dr. Wahlstrom to testify at the sentencing hearing.

In light of this decision by the defendant that Dr. Wahlstrom should not be called to testify in his behalf, the trial court also struck Dr. Wahlstrom's report from evidence and excluded it as a basis for the opinion of Sturman, defendant's mitigation specialist. The defendant objected to this ruling, arguing that without Dr. Wahlstrom's report, there was no evidence regarding defendant's psychiatric condition to aid the court's decision with respect to whether defendant should be sentenced to the death penalty.

On appeal, defendant renews this objection to the trial court's ruling. The defendant claims that the trial court's decision to strike Dr. Wahlstrom's report was erroneous because it is common for an expert, such as a mitigation specialist, to rely upon the reports of other individuals who are not called to testify at trial.

We need not reach this question. It is well established that the erroneous exclusion of evidence is ground for a new proceeding where it can be said that the excluded evidence, if considered, would have altered the outcome of the proceeding. (See, *e.g., People v. Enis* (1990), 139 Ill. 2d 264, 290.) Even assuming *arguendo* that the trial court erred in striking Dr. Wahlstrom's report as a basis for Sturman's opinion in mitigation, the record fails to demonstrate that the trial court's sentencing decision would have been different, if the report had been included.

Defendant offered Dr. Wahlstrom's report as evidence that defendant suffered from a mental or emotional disturbance at the time of the crimes. Such dis-

turbance is a statutory mitigating factor with respect to imposition of the death penalty. (720 ILCS 5/9—1(c)(2) (West 1992).) However, as the trial court noted in the instant cause, Dr. Wahlstrom's report did not shed any light on the critical question of whether defendant was suffering from a mental or emotional disturbance at the time of the commission of his crimes. Dr. Wahlstrom's report indicated that defendant suffered from substance abuse but that such abuse was in complete remission. The report further stated that defendant also suffered from post-traumatic stress syndrome which was in partial remission. The report did not state whether these conditions amounted to a "mental disturbance" from which the defendant was suffering at the time of his commission of the crimes.

It is highly unlikely that the information provided in the psychiatrist's report would have altered the outcome of defendant's sentencing hearing. Dr. Wahlstrom's report established at best that defendant suffered from partially recovered post-traumatic stress syndrome. In our view, a rational finder of fact would not have found this evidence of defendant's mental condition a sufficiently mitigating circumstance to avoid imposition of the death penalty. The State's evidence established that defendant participated in the brutal, premeditated murder of two persons who knew and befriended the defendant and his co-felon. Defendant had a previous murder conviction and had a history of infractions while imprisoned. Considering all of the evidence, we conclude that the information contained in Dr. Wahlstrom's report would not have persuaded the trial court, sitting as finder of fact, to reject imposition of the death penalty.

## II

Defendant also argues that the trial court should have appointed substitute counsel to represent him with

respect to an allegation that the defendant was denied the effective assistance of counsel at his sentencing hearing.

The record reflects that after the sentencing hearing, defense counsel filed a motion to reconsider. In this motion, defendant's attorney claimed that he had given erroneous advice to the defendant with respect to calling Dr. Wahlstrom as a witness in defendant's behalf. Counsel represented that he had informed defendant that Dr. Wahlstrom, if asked, would testify to self-incriminating statements made by the defendant to the psychiatrist. The attorney also told defendant that these self-incriminating statements could be used against him in the event of a retrial. Defense counsel stated in his motion that upon further research, he "believe[d] he erroneously advised the defendant as to the effects of his waiver on a retrial of the instant case." The trial court denied the defense counsel's motion to reconsider the defendant's sentence.

Upon review, defendant asserts that the trial court should have appointed another attorney to argue the motion to reconsider filed by his sentencing attorney. A defendant's post-trial argument that he has been deprived of the effective assistance of counsel may warrant appointment of a new attorney to present the defendant's claims. (*People v. Krankel* (1984), 102 Ill. 2d 181, 189.) However, there is no *per se* rule that requires appointment of different counsel whenever the defendant makes an argument of incompetent representation. (*People v. Nitz* (1991), 143 Ill. 2d 82, 134.) Whether new counsel should be appointed depends upon the nature and substance of the defendant's argument. If there is no validity to the defendant's claim, or if the defendant's claim pertains to a matter of trial strategy, then new counsel need not be appointed. If the defendant's contention indicates that his attorney may have

neglected the defendant's case, then new counsel should be appointed. *Nitz*, 143 Ill. 2d at 134; *People v. Ramey* (1992), 152 Ill. 2d 41, 52.

Defendant does not argue that his sentencing attorney may have neglected defendant's case at the sentencing hearing. Defendant claims that new counsel, if appointed, could have undertaken an investigation to determine whether his sentencing attorney did, in fact, neglect defendant's case. For example, defendant suggests that this new attorney could have investigated in greater detail and could have provided a record to show precisely what incriminating statements defendant made to Dr. Wahlstrom. Defendant also suggests that new counsel could have shown, of record, the precise nature and substance of sentencing counsel's advice to defendant. Defendant suggests that substitute counsel was necessary to determine whether or not the advice which defense counsel gave to the defendant was accurate. Defendant also offers that substitute counsel might have found alternate methods to examine Dr. Wahlstrom without revealing the circumstance that defendant had made incriminating statements to the psychiatrist.

We do not believe that defendant's allegations rise to the level of neglect of a client's case that would warrant appointment of substitute counsel. Defendant presents arguments that amount to no more than speculation that substitute counsel may have discovered new or additional information or a different legal theory in defendant's behalf. In order to show that he is entitled to appointment of new counsel, defendant must present a record that offers more than conjecture and speculation. We find defendant's arguments an inadequate basis to justify the conclusion that the trial court should have appointed substitute counsel in defendant's behalf to argue the merits of a motion to reconsider.

In addition, we believe that defendant's claim raises a matter pertaining to a strategic decision made during the course of the defendant's sentencing hearing. Generally, the decision to call a witness to the stand is a matter of trial strategy. (*E.g.*, *People v. Hobley* (1994), 159 Ill. 2d 272, 305.) We note that the defendant made the final decision not to call Dr. Wahlstrom to the stand. Given these considerations, we find no error in the trial court's failure to appoint new counsel to represent defendant with respect to a claim of ineffective assistance of counsel at his sentencing hearing.

Defendant contends that he decided not to call Dr. Wahlstrom to testify because defendant's attorney gave defendant incorrect advice regarding the scope of Dr. Wahlstrom's testimony. However, defendant cites to no case law authority or other precedent to support his argument that the advice given to defendant by his sentencing attorney was inaccurate. Furthermore, the record indicates that the defendant was aware that the psychiatrist's report of his interview with the defendant was not confidential. It appears from the record that defendant's attorney advised him that if Dr. Wahlstrom were called to testify, he would be subject to examination that would reveal defendant's incriminating statements regarding his involvement in the crimes. Dr. Wahlstrom's report of his interview with the defendant specifically noted that the psychiatrist had informed the defendant that the interview was "nonconfidential in that a copy of the report would be sent to the attorneys working with him, and that it then may be seen by the judge and the state's attorney." In light of these circumstances, we conclude that defendant was not entitled to substitute counsel to argue the motion to reconsider submitted by his sentencing hearing.

## III

Defendant argues that there was reversible error in

the allegedly improper introduction of evidence that defendant was a member of a gang while he was imprisoned for his 1975 murder conviction. Relying on *Dawson v. Delaware* (1992), 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093, defendant claims that the erroneous introduction of this evidence violated his due process rights to a fair trial.

In *People v. Coleman* (1994), 158 Ill. 2d 319, this court explained that the *Dawson* Court held unconstitutional the introduction of an accused's membership in a gang "where the evidence was not linked to the murder committed and had no relevance to the sentencing proceeding." (*Coleman*, 158 Ill. 2d at 355.) We additionally noted that evidence of gang affiliation is admissible when it pertains to the defendant's "prison behavior, violations, and discipline" and is offered to show "defendant's character and record in prison." *Coleman*, 158 Ill. 2d at 356.

In the present cause, evidence regarding the defendant's gang membership was introduced to show that defendant's infractions while in prison arose from gang-related activities. According to testimony presented by the State at defendant's sentencing hearing, defendant had committed various infractions of prison rules. A number of these infractions arose from his possession of gang items or documents. Consequently, the evidence of defendant's gang affiliation pertained to defendant's prison record, and was therefore admissible at defendant's sentencing hearing. The trial court committed no error in admitting this evidence. See also *People v. Ward* (1992), 154 Ill. 2d 272, 341-44.

IV

Defendant claims that his 1975 murder conviction could not be used to find him eligible for the death penalty. Section 9—1(b)(3) of the Criminal Code of 1961 states that conviction for two murders renders a defen-

dant eligible to be sentenced to death. (720 ILCS 5/9—1(b)(3) (West 1992).) The trial court found the defendant eligible because he had committed a murder in 1975 and was also responsible for the murder of Robert Nelson.

Defendant claims that his 1975 murder conviction could not be the basis of his eligibility for the death penalty because he was 17 years old when he committed the crime. However, this court has already rejected such an argument. In *People v. Lear* (1991), 143 Ill. 2d 138, 149, the court held that the sentencer may rely on a murder committed while the defendant was a juvenile as an aggravating factor that renders the defendant eligible to receive the death penalty. Defendant offers no sound reason to deviate from that holding. We continue to adhere to the court's position in *Lear*, and on that basis conclude that defendant's 1975 murder conviction was properly relied upon by the trial court to find that defendant was eligible to receive the death penalty.

Defendant also argues that his 1975 murder conviction could not be relied upon by the sentencer because the death penalty statute was not in effect when that prior conviction was entered. However, in *People v. Franklin* (1990), 135 Ill. 2d 78, 107-08, the court held that there is no violation of constitutional principles of *ex post facto* when a court relies upon a conviction that was entered before the effective date of the death penalty statute. (See also *People v. Edgeston* (1993), 157 Ill. 2d 201, 228.) Defendant suggests no ground to overrule this precedent. We remain persuaded by the analysis in *Franklin*, and accordingly reject defendant's argument in the present cause.

## V

Defendant argues that this court must vacate one of his two home invasion convictions because the State's

evidence proved only one illegal entry into Nelson's apartment. The prosecution charged defendant with two counts of home invasion, alleging that defendant entered Nelson's apartment and threatened Nelson with imminent use of force (count I), and also threatened Brown with imminent use of force (count II).

The offense of home invasion occurs when a person, without lawful authority, enters the home of another. and "[w]hile armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons *** whether or not injury occurs, or *** [i]ntentionally causes any injury to any person or persons within such dwelling place." (720 ILCS 5/12—11(a)(1), (a)(2) (West 1992).) Defendant contends that it is well settled that "a defendant can stand convicted of only one count of home invasion where there was only one entry regardless of the number of victims." (*People v. McDarrah* (1988), 175 Ill. App. 3d 284, 300; see also *People v. Shriner* (1990), 198 Ill. App. 3d 748, 755; *People v. Criss* (1988), 169 Ill. App. 3d 926, 931-32; *People v. Parker* (1988), 166 Ill. App. 3d 123, 130; *People v. Yarbrough* (1987), 156 Ill. App. 3d 643, 646; *People v. Triplett* (1985), 138 Ill. App. 3d 1070, 1074; *People v. Morrison* (1985), 137 Ill. App. 3d 171, 177; *People v. Hawkins* (1984), 125 Ill. App. 3d 520, 523; *People v. Ammons* (1983), 120 Ill. App. 3d 855, 861.) The State concedes error on this point. Consequently, we hereby vacate one count of the home invasion convictions entered against the defendant.

However, we decline defendant's invitation to remand the matter for an additional sentencing hearing with respect to defendant's death penalty sentence. This court has held that a finding of eligibility based upon one statutory factor is not rendered invalid simply because the sentencer may have also relied upon another statutory eligibility factor that is subsequently

held invalid. (See *People v. Todd* (1992), 154 Ill. 2d 57, 74-75.) In the present case, the trial court determined that defendant was eligible for the death penalty because he had murdered two persons (see 720 ILCS 5/9—1(b)(3) (West 1992) (murder of two or more persons is statutory ground to impose death penalty)) and because he had committed other felonies, such as armed robbery, home invasion, and residential burglary, during the course of the murders (see 720 ILCS 5/9—1(b)(6) (West 1992) (commission of armed robbery, home invasion, or residential burglary during course of murder is statutory ground for eligibility for death penalty)). Thus, the record shows that the trial court found two separate and independent grounds for defendant's eligibility for the death penalty. Neither of these grounds involved defendant's having been convicted of two counts of home invasion. As a result, vacatur of one count of home invasion does not undermine the validity of the trial court's finding of eligibility for the death penalty in the present case.

## VI

Defendant raises two arguments wherein he challenges the constitutionality of the Illinois death penalty statute. Neither has merit, however, since they have been repeatedly rejected by this court.

Initially defendant claims that the death penalty statute is unconstitutional because it places a burden of proof on the defendant that precludes meaningful consideration of evidence presented in mitigation. We have rejected this argument in previous capital cases and continue to adhere to that position in the present cause. (*People v. Page* (1993), 155 Ill. 2d 232, 283; *People v. Mitchell* (1992), 152 Ill. 2d 274, 345-46.) We similarly reject defendant's argument that the statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed sentences,

having considered and rejected this challenge in prior decisions of this court. *People v. Patterson* (1992), 154 Ill. 2d 414, 488; *People v. Fields* (1990), 135 Ill. 2d 18, 75.

For the reasons stated above, we vacate defendant's conviction of one count of home invasion. In all other respects, we affirm the judgment of the circuit court of Cook County. We direct the clerk of this court to enter an order setting Tuesday, January 9, 1996, as the date on which the sentence of death entered by the circuit court is to be carried out. The defendant shall be executed in a manner provided by law (725 ILCS 5/119—5 (West 1992)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution where the defendant is now confined.

*Affirmed.*