# Illinois Official Reports

## Appellate Court

***People v. Wilson*, 2015 IL App (4th) 130512**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRETT M. WILSON, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-13-0512 |
| Filed | December 3, 2015 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 12-CF-51; the Hon. Scott D. Drazewski, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and Martin J. Ryan (argued), all of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Linda Susan McClain (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Justices Pope and Holder White concurred in the judgment and opinion. |

¶ 1      In January 2013, defendant, Brett M. Wilson (born April 14, 1993), was convicted of five counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2010)) and five counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2010)). He was sentenced to five terms of natural life. Defendant appeals his conviction and sentence. On appeal, he argues (1) the prosecutor improperly acted as a "human lie detector" when he, during closing argument, commented on the defendant's and other witnesses' mannerisms during videorecorded interviews; (2) the trial court erred by allowing the State to elicit testimony regarding other crimes allegedly committed by defendant when no foundation or specificity was provided to show those crimes occurred before the charged offenses and to permit defendant to mount an effective defense; (3) the trial court erred when it did not allow defendant to play a videorecorded interview of a prior consistent statement to rebut the State's inference the witness had a motive to lie or made a recent fabrication; and (4) his natural life sentences violate the eighth amendment's prohibition against cruel and unusual punishment (U.S. Const., amend. VIII), his right to due process (U.S. Const., amend. XIV), and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). We affirm in part, reverse in part, and remand for resentencing.

¶ 2      I. BACKGROUND

¶ 3      Defendant is the son of Belinda and Bill Lovall. Belinda and Bill share two other children, daughters Br. L. and Bi. L. Belinda and Bill divorced. Belinda later married Tom Hargis. Three children were born during their marriage: A.H. (born June 16, 2004), T.H. (born October 12, 2005), and J.H. (born April 15, 2003). When Tom and Belinda separated, Belinda retained custody of A.H., T.H., and J.H. Belinda and the children resided in Clinton. In March 2010, Belinda and Bill renewed their relationship. Belinda and her five children moved to Bloomington to reside with Bill.

¶ 4      In February 2012, defendant was indicted by a grand jury on five counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2010)) and five counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2010)) involving three victims: A.H., T.H., and J.H. Counts I through III assert defendant committed mouth-to-penis penetration with each child, each under the age of 13, on October 19, 2010. Count IV alleges penis-to-mouth penetration with A.H. on June 16, 2011. Count V alleges penis-to-mouth penetration with A.H. on some day between October 1, 2011, to November 30, 2011. Counts VI through X allege aggravated criminal sexual abuse.

¶ 5      At trial, A.H., age 8, testified she and her siblings played together, including games like hide-and-seek and tag. A.H. testified defendant made her put her mouth on his penis. Before this, defendant unzipped his pants, but he did not pull them down. He did not otherwise touch A.H. The first time this conduct occurred was at a time when Belinda and Bill were out. A.H. was then seven years old. The family lived on McGregor Street. A.H. was playing in her room, and defendant asked her to go into her closet with him. The doors were closed. A.H. testified her mouth was on his penis a short time. Defendant told her if she told anyone she would go to foster care. After the contact, A.H. exited the closet and went to the front room to watch television. Defendant called J.H. into the closet. A.H. did not tell anyone right away due to

defendant's statement she would go into foster care if she told. A.H. did not tell her mother immediately because she did not return home until later.

¶ 6 A.H. testified regarding another incident on her eighth birthday, June 16, 2012. A.H.'s siblings, mother, stepfather, and grandparents were present. Everyone was outside. A.H. opened her presents. Defendant told her he had a present for her. Defendant took A.H. into the house. The two went into A.H.'s bedroom, and defendant had A.H. put her mouth on his penis. A.H. kept her mouth on his penis until defendant told her to stop. They returned outside.

¶ 7 A.H. testified regarding a third incident. A.H. and her family moved to a new house. A "couple days after" the move, defendant babysat A.H, J.H., T.H., Br. L., and Bi. L. During that time, after they finished eating, A.H. went into her room to play. She closed her door. Defendant followed her. Defendant unzipped his pants and told A.H. to put her mouth on his penis. A.H. complied. When defendant left the room, A.H. stayed and played with her toys. No adults were in the house. Her mother returned in the afternoon.

¶ 8 According to A.H., defendant forced her to do the same at her grandmother's house. A.H. could not say how old she was or whether the event occurred before or after she moved.

¶ 9 At this point in the testimony, the trial court addressed the jury. The court stated the following:

"Folks, let me indicate that what counsel had asked to approach the bench about was the necessity that being of me informing you about the anticipated next evidence or testimony from this witness, which is the evidence that is going to be elicited or attempted to be elicited is being received that the defendant may have been involved in another offense other than that that has been charged within the indictments that I previously read to you. This evidence, should it be received on the issue of the defendant's identification, his presence, his design, or his motive and may be considered by you only for that limited purpose.

It is for you to determine whether or not the defendant was even involved in this conduct, and if so what weight should be given to this evidence on the issues that I indicated, which is identification, presence, intent, and design."

¶ 10 A.H. continued by testifying regarding the incident in her grandmother's shed. A.H. had been playing inside a large shed. It contained lawn mowers, hammers, and other tools. Defendant entered the shed and told A.H. to put her mouth on his penis. Bi. L. and Br. L. were also in the shed. Br. L. was 10 to 12 feet behind A.H. There were a "couple toolboxes" between Br. L. and A.H. Defendant had Br. L. do the same thing. A.H. saw Br. L. put her mouth on defendant's penis. Defendant then took his sisters to the park, where they "played for a couple hours."

¶ 11 A.H. lived with her mother and Bill when the incidents occurred. A.H. did not tell Belinda and Bill until after she talked to "Mr. Mike," Detective Michael Burns. A.H. first reported the incident to her father, after J.H. did. After A.H. told her father about the events, A.H. also told Detective Burns and "Miss Molly" at the Child Advocacy Center.

¶ 12 On cross-examination, A.H. testified she lived with her grandmother, Phyllis, and Tom. A.H. talked about the incidents with "Adam," Phyllis, and Rebecca, who lived with Tom and Phyllis for a while. A.H. had seen Detective Burns before. She talked to him when Detective Burns investigated Bill for spanking J.H. Detective Burns asked A.H. if there was anything happening at her house she did not like or did not want to happen and if there was anything she

needed to discuss. A.H. did not report the incidents with defendant. On redirect examination, A.H. explained she did not tell Detective Burns about the sexual contact because Detective Burns was at her house before those incidents occurred.

¶ 13    In January 2012, Detective Burns interviewed A.H. The video of A.H.'s interview was played for the jury. During the interview, A.H. reported defendant "a lot of times he made us put our mouth on his wee wee." This conduct occurred at the house on McGregor Street and at the Bloomington house "in our closet." A.H. stated defendant "only let the boys do it once and he said that I was the best at doing it and I had to keep on doing it but the boys didn't." A.H. reported she would be watching television and defendant would call them into the closet "one by one." Once, while playing hide-and-seek, defendant made A.H. "do it while we were waiting for everyone to hide." He told A.H. if she "didn't do it he would tell [Belinda] and Bill that [she] was being bad and that [she] would have to stand in the corner." A.H. reported defendant would rub his penis with his hand while it was in her mouth. He threatened, if she told anyone, A.H. would go into foster care and not see her father or her brothers.

¶ 14    T.H., age seven, testified, after the State asked if "anything ever happened with [defendant] that you didn't have fun doing," defendant had "covered [his] mouth and nose," but he forgot "about the rest." T.H. remembered talking to someone at the place where the prosecutor and T.H. had met before. He remembered talking about "bad things" that happened with defendant. T.H. said defendant made T.H. put his mouth on defendant's penis. T.H. did not remember where he lived at that time, but he lived with his mother.

¶ 15    The jury viewed T.H.'s interview by Detective Burns. T.H. stated, "I have been really bad cause cause cause cause uh [defendant] uh said we have to put his mouth on his wiener." T.H. reported defendant told them "[A.H.] is the best one and she has to keep on doing it and doing it all over again." This happened more than once. T.H. said, "[l]ike 5 times." Defendant told the children not to tell or they would go to foster care. T.H. said Belinda and Bill once saw defendant making T.H. put his mouth on his penis. They said defendant had to move out of the house. T.H. also testified defendant had played with T.H.'s penis, pulling on it "like 5 or 3 times."

¶ 16    J.H., age nine, testified there were "lots of times" when his mother and Bill were gone and defendant babysat the younger siblings. There were other times in which a different sitter came to their home. Defendant made J.H. put his mouth on defendant's penis. J.H. was seven or eight when this occurred. They lived on McGregor Street at the time. J.H. was in the living room. Defendant called J.H. into the girls' room. Defendant and J.H. went into the closet. No one else was in there. The closet door was open, but the door to the room was closed. Defendant told J.H. to put his mouth on defendant's penis. Defendant unzipped his pants and pulled them down. J.H. stopped when defendant told him to stop. Defendant told J.H. to go to the living room and watch television. J.H. did this once.

¶ 17    J.H. testified he was scared to tell his mother. J.H. reported, "once [defendant] put his hand over our mouth and nose and I told Bill that, and then he said he didn't do that, so I was scared that–I didn't know if they were going to believe me." Defendant also said if J.H. told, he would never see his father again and would go into foster care.

¶ 18    On cross-examination, J.H. testified he remembered speaking with Detective Burns at the Children's Advocacy Center. J.H. told Detective Burns the contact occurred while Belinda and Bill were out for Bill's birthday. J.H. also spoke to Detective Burns about the spanking incident. J.H. reported to Detective Burns he spoke to the Clinton police before speaking to

him. After the visit to the police station, Tom took J.H. to buy a dart gun, soda, and candy bars. J.H. testified the discussion with Detective Burns about spanking occurred before the incident in the closet.

¶ 19 J.H. remembered talking to a judge in Clinton. He did not know if this was during his parents' divorce case. When asked if he remembered saying, "sorry, mommy, daddy makes me say things," J.H. said no. On redirect examination, J.H. denied making that statement.

¶ 20 Michael Burns, a detective with the Bloomington police department, testified he worked with victims who were minors. He conducted interviews of A.H., T.H., and J.H. Those interviews were videorecorded. There were no witnesses other than the children. Detective Burns interviewed defendant at the police station on January 18, 2012. That interview was played for the jury. In this interview, defendant stated his date of birth as April 14, 1993.

¶ 21 According to Detective Burns, the children reported to "Officer Hughart" at the Bloomington police station defendant's sexual misconduct toward them. A.H. stated defendant made her "kiss his wee-wee." J.H. and T.H. used the same language, stating defendant made them "kiss his wee-wee." During the interview, T.H. reported having to do it "much less than her." J.H., however, told Detective Burns he and T.H. had to do it four or five times. At this point, Detective Burns did not determine a crime had been committed. Detective Burns spoke to Tom after the interviews of the children. Tom denied having any knowledge of what the kids were telling Detective Burns. At this point, Detective Burns had not interviewed Br. L. or Bi. L.

¶ 22 After interviewing A.H., T.H., and J.H., Detective Burns contacted Belinda and had Belinda bring Br. L. and Bi. L. for interviews. Br. L. corroborated some of the statements of A.H., T.H., and J.H., but she did not provide a statement that coincided with the actual abuse. Bi. L.'s interview also did not corroborate actual abuse.

¶ 23 Detective Burns testified to another occasion where Tom alleged abuse and Detective Burns was brought in to investigate. One incident occurred on June 15, 2010. It was alleged defendant was choking J.H. After interviewing the children, Detective Burns closed the investigation. On May 23, 2011, Tom made the allegation Bill spanked J.H. Detective Burns talked to J.H., A.H., and Belinda and concluded the allegations were unfounded. During his discussions with A.H. and J.H., neither child raised the issue of sexual misconduct by defendant.

¶ 24 Regarding the allegations of sexual abuse, Detective Burns made arrangements through defendant's grandmother for defendant to meet with him. Defendant met with Detective Burns voluntarily. At this point in the testimony, defense counsel commented on Detective Burns's position in the video as indicative of an attempt to manipulate defendant. Defendant denied the abuse.

¶ 25 Before rendering his opinion he believed the children, Detective Burns had no knowledge of Tom's petitions for orders of protection filed by Tom against Belinda. When asked if he had "checked up on Tom's litigation history," Detective Burns replied he tried to "go into the interviews with an open mind and unbiased about anybody involved in the case." He did not know about the order of protection Tom sought against defendant in Macon County in 2010.

¶ 26 On redirect examination, Detective Burns testified he knew of an order of protection in place against defendant, but he did not recall the specifics of how he knew. Detective Burns

also knew about an order of protection Belinda sought. At the time of the interviews, A.H., J.H., and T.H. resided with Belinda. Defendant resided with his grandmother.

¶ 27    On behalf of the defense, Br. L., age 11, testified she resided with Belinda, Bill, and Bi. L. Br. L. testified Bill's birthday is on October 19. She testified on his birthday in 2010, Belinda and Bill went out and left the children with a sitter, Kaitlyn Kindig. Defendant had babysat Br. L. "a couple of times," but each time his girlfriend was with him. Br. L. testified, on A.H.'s seventh birthday, the family opened presents at the house and the family then went to Grady's, a pizza place with rides. The family went inside and ate pizza. They stayed at Grady's for two hours, after which they returned home and ate cake. A.H. was never alone at her birthday party.

¶ 28    Br. L. testified defendant resided with his grandparents in Clinton. There was a shed at their house. Br. L. had not been in the shed. She did not know what was inside the shed. Defendant had not forced Br. L. to put her mouth on his penis. She had not seen defendant do this to A.H. or Bi. L. in the shed. At no time during a visit to the grandparents' house did defendant take her, Bi. L., and A.H. to the playground. Br. L. recalled talking to Detective Burns. Defendant had never done anything to make her feel uncomfortable.

¶ 29    On cross-examination, Br. L. acknowledged she had not seen defendant for a long time and she wanted him home. Br. L. testified she was nine years old on her father's birthday, and nothing interesting happened that night. There were sitters often at the house. Kaitlyn and defendant were the only ones who babysat for them. Br. L. did not remember anything about her father's last birthday, when she was 10. Br. L. did not remember if her parents went out or whether defendant babysat that day.

¶ 30    Regarding A.H.'s birthday, Br. L. testified a lot of people were at the house. On that day, the children were playing outside. Br. L. acknowledged there were times when she was not with A.H. on that day. Br. L. testified they were at the house for a while before they went to Grady's.

¶ 31    Defendant sought admission of the videorecorded interview of Br. L., conducted on January 1, 2012. Defendant argued the State implied recent fabrication and that Br. L. was testifying differently today out of favoritism. The court questioned defendant, asking, "what specific assertions with regard to her testimony and recollection of particular incidents do you believe that the State made as it relates to recent fabrication as opposed to an inference of bias, hostility, or motive to testify in a certain manner?" Defendant argued it was not hearsay as it would be used to rebut the claim of recent fabrication. The State argued the video was being offered to improperly bolster Br. L.'s testimony with a prior consistent statement. The State maintained it simply cross-examined her to get into details that defense counsel did not seek during direct examination. The State argued its questions did not open the door by challenging Br. L. The State also argued the jury heard Detective Burns state Br. L. denied the incidents occurred.

¶ 32    The trial court excluded the video, after concluding it would be improper to replay the entire questioning for the jury. The court, however, allowed defense counsel to ask Br. L. if she told Detective Burns during her interview what she testified to on that day.

¶ 33    On redirect examination, Br. L. testified when she spoke to Detective Burns on January 1, she told him what she testified to in court.

¶ 34    Bi. L., age 16, testified regarding her father's birthday in October 2010. Belinda and Bill went out with a friend. That friend's daughter, Kaitlyn, babysat the children. Defendant

babysat the children on other occasions, sometimes by himself and other times with his girlfriend.

¶ 35 According to Bi. L., on A.H.'s seventh birthday, the family went to Grady's. The party began at the house. They opened presents on the patio before they left. At Grady's, they ate supper and played on the rides. They returned to the house to eat cake and ice cream. It was dark at this time. Defendant left with his grandmother before the family went to bed.

¶ 36 Bi. L. testified her grandmother in Clinton had a shed, but Bi. L. had not been in the shed. She denied defendant took her there. Since the family moved to Bloomington, there was not a time when defendant took them to the playground in Clinton. Defendant had never touched Bi. L. inappropriately. Bi. L. stated her testimony was the same as her responses in the interview with Detective Burns. She never saw defendant do anything bad to A.H.

¶ 37 On cross-examination, Bi. L. testified she missed defendant and would like him to return home. Bi. L. testified, on Bill's birthday in 2012, they "basically didn't do anything." They stayed home. Regarding Bill's birthday in 2011, Bi. L. did not remember what they did. When asked if she remembered if defendant was there and babysat, Bi. L. recalled that he did. Bi. L. acknowledged, at A.H.'s birthday party, everyone was not together the entire time. Bi. L. denied being in a shed at her grandmother's present or previous house.

¶ 38 Belinda testified Tom and A.H., T.H., and J.H. resided with Tom's mother in Decatur. When Belinda and Tom separated, the initial period was amicable. That changed when Belinda reunited with her first husband, Bill, in March 2010. Tom became "very irate." In May 2010, Belinda secured an order of protection against Tom. This order gave Belinda physical custody of A.H., T.H., and J.H. At this time, defendant lived in the same house. In June 2010, Belinda and her children moved to Bloomington with Bill. Defendant returned to Clinton.

¶ 39 According to Belinda, in June or July 2010, Tom petitioned for an order of protection against defendant. He also filed divorce papers, requesting custody of A.H., T.H., and J.H. The divorce was granted, but custody and child-support issues remained.

¶ 40 Regarding Bill's birthday in October 2010, Belinda testified she and Bill went to Shooter's Lounge with two friends. There, they met with several others. That day, Kaitlyn babysat the children. Defendant was not at their house that day, as defendant and Bill were not speaking. On A.H.'s seventh birthday, in June 2011, they had a party at their house. Defendant and Belinda's mother were there. They "were all hanging around outside playing, waiting for Bill to get off work." After Bill returned and showered, they "all opened presents outside on the patio, piled into the car, and went off to Grady's." The group returned to the house for cake and ice cream. Defendant stayed about 15 to 30 minutes. He returned to Clinton with his grandmother. There was no opportunity for anyone to be alone with A.H. The house was small, so she knew where A.H. was.

¶ 41 Belinda testified defendant babysat occasionally for the children, but he did not do so alone. Defendant brought a friend or his girlfriend with him. Belinda testified regarding the events of January 1, 2012. That day, Tom was to return the younger children from a visit. Belinda received a phone call from Detective Burns, who asked her to bring Br. L. and Bi. L. to the Children's Advocacy Center. Belinda complied. Eleven days earlier, there was a custody hearing in De Witt County. The court appointed a guardian *ad litem* for the children. After defendant's arrest, the court was advised and Tom was given custody in March 2012.

¶ 42    On cross-examination, Belinda agreed Tom knew defendant did not reside and had not resided with her for a long time. Belinda testified on Bill's birthday in 2011, they went to Six Strings. When asked if defendant babysat for that birthday, she said she did not think so. When asked if it would surprise her to know defendant said he watched the children on Bill's 2011 birthday, she said no and admitted it was possible.

¶ 43    Belinda testified she was watching A.H. during her seventh birthday party. When questioned, "[y]ou were watching [A.H.] the entire time during this party?" Belinda responded, "It was her birthday." The children were playing outside in the yard she was facing while sitting. Belinda acknowledged, if A.H. had to use the bathroom during her party, there could have been "multiple" occasions in which A.H. may have been alone with someone else. Belinda testified defendant had on occasion babysat the children alone, but not since the family moved to Bloomington. Belinda explained as follows:

> "When [Bill] and I go out, the children are in bed before we leave, and the babysitter just sits and watches TV. [Defendant] would bring someone. He would bring his X-box. He would play our Wii. He brought someone so he wouldn't be bored just sitting there by himself until we got home. So, yes, while we lived in Bloomington, he absolutely had someone with him every time he watched the children."

¶ 44    Christy Kindig testified she was out with Bill and Belinda for Bill's birthday on October 19, 2010. Christy brought her daughter, Kaitlyn, to the Lovalls' house so she could babysit the younger kids. Christy picked up her daughter early the next morning. Christy did not see defendant. On cross-examination, Christy testified she did not remember other specific dates Kaitlyn babysat for the Lovalls. She testified she might remember that date because it was for a birthday and it was a school night. Kaitlyn did not go to school the next day because she was tired. Kaitlyn rarely babysat during the week.

¶ 45    Kaitlyn testified she babysat for the children during Bill's birthday party in October 2011. She spent the night and was too tired to go to school the next day. Defendant was not there. Kaitlyn babysat for the five younger children.

¶ 46    Nancy Holt, defendant's maternal grandmother, testified in March 2011, she attended a court proceeding regarding the divorce. The children went in and spoke to the judge. When the children exited that hearing, Holt heard J.H. say to Belinda, "Mommy, I'm sorry." When Belinda asked him why, J.H. said, "Daddy said if I didn't say what he told me, I would never see you or him again. They would put me in care."

¶ 47    Holt testified regarding A.H.'s seventh birthday. She drove defendant from her home in Clinton to Bill and Belinda's house. She never saw defendant alone with A.H. When asked about her shed, Holt testified it was full of things. It was approximately 8 feet by 10 feet. There was no room to stand in the shed without removing some of the contents. The shed had a lock on it.

¶ 48    On cross-examination, Holt testified her first address in Clinton had a playground not far away. It also had a shed. She moved from that house on October 1, 2010.

¶ 49    Defendant testified on his own behalf. According to defendant, his relationship with Tom was rocky. Defendant believed in June or July 2010, Tom filed an order of protection petition against him. At that time, the three younger children resided with Belinda. After defendant moved to his grandmother's house in Clinton, he did not see his younger siblings very often. Defendant stated he was not alone with A.H. on her seventh birthday. He denied taking his

siblings into a shed at his grandmother's house. Defendant did not tell the children to put their mouths on his penis.

¶ 50      On cross-examination, defendant testified he took the five children to a playground in Clinton. They played games there. When Detective Burns asked about the playground, defendant denied going there. Defendant had been in his grandparents' shed. There were tools in the shed. The first shed was fairly big.

¶ 51      Defendant testified he attended A.H.'s birthday. He acknowledged telling Detective Burns he had not been to her birthday for a while. Defendant denied knowing one of the allegations involved A.H.'s birthday when he met with Detective Burns. Defendant testified he babysat for the children on Bill's birthday in 2011. There were other times he babysat the children.

¶ 52      Defendant testified he planned to enter the military after high school graduation and would like to do so. Defendant knew he would not be allowed into the armed services with a felony. He knew that when he spoke to Detective Burns and asked him about it. The following questions and answers occurred:

> "Q. When Detective Burns asked you a question, he asked you what should happen?
>
> A. Yes.
>
> Q. And you told Detective Burns that it was just that, just putting your penis in a child's mouth, counseling so someone could get out of it, right?
>
> A. Yes."

¶ 53      On redirect examination, defendant testified he was truthful with Detective Burns. The following discussion occurred:

> "Q. You weren't surprised at all when Detective Burns told you you were under arrest, were you?
>
> A. No, because I had already figured out they had his mind made up on taking me into custody.
>
> Q. You weren't surprised at all when Detective Burns told you the types of things that he had been told, were you?
>
> A. I was.
>
> Q. That interview, that was you surprised?
>
> A. Yeah.
>
> Q. And your reactions to him telling you what your little sister and little brother told him happened, that was you not surprised?
>
> A. I was not surprised, but I was in shock."

¶ 54      The State began its closing argument by playing the following excerpt from defendant's videotaped statement, after directing the jury to "watch his hands":

> "DETECTIVE BURNS: Are you telling me they're lying?
>
> THE DEFENDANT: They may not be lying, but it's not with me, what you're saying.
>
> DETECTIVE BURNS: They have a lot of–and they didn't talk about their dad. They didn't talk about your dad. They talked about you, specifically you.
>
> THE DEFENDANT: But it wasn't me.

DETECTIVE BURNS: Who was it then?

THE DEFENDANT: I don't know, but it wasn't me.

DETECTIVE BURNS: You're under arrest."

¶ 55 The State continued with the following:

"Shocked. That's him shocked that he was being arrested. Now, at the beginning of this trial, I asked you to pay very close attention to the testimony of the people and their mannerisms, and I think you just did. And if you did that, you paid attention during that interview, and you watched over and over again during that interview as he wiped his hands on his legs, as he wiped his hands on his legs, and then after he was shocked that he was arrested, if you paid attention, you saw him after that straighten his legs and uncross them and fold his hands.

This case has kind of unfolded before you, and what it has become and what I, you realize now is this is a case that involves a stone-cold defendant and perfect victims.

* * *

[W]hen these kids got on the stand, you saw when they were uncomfortable. You saw their mannerisms change. You saw when they had to unfold something in front of you strangers, something that they didn't want to unfold. You saw how that affected them. You saw [T.H.] You saw that young child, when he was asked to describe what his brother did to him. You saw the words get caught by his lips. He couldn't even say them. What did your brother do to you? He made me put my mouth on his–he couldn't get them out. That's not just those kids. You saw that from [A.H.] You saw that from [J.H.] Ladies and gentlemen, you saw that from Br. L., and you saw that from Bi. L. You saw the manner of those girls change when I started asking them about things their brother did that made them uncomfortable, and that's why I presented that to you in opening statements because that is this case. This case is kids. This case is a crap family situation and the perfect victims right in the middle of it. And that stone cold, without emotion defendant, not surprised by the allegations."

¶ 56 In rebuttal, the State asked the jury again to focus on the mannerisms of the children, "[y]ou remember how their mannerisms and posture changed here on the stand, and you think about that because that's what this case is about."

¶ 57 Defendant was found guilty on all charges.

¶ 58 In March 2013, the trial court held defendant's sentencing hearing. The presentence investigation report indicated defendant was 19 years old at the time. He graduated from high school, had been employed, had no other criminal record, and began the process of joining the Army. The State, citing section 11-1.40(b)(1.2) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/11-1.40(b)(1.2) (West 2010)), argued the law required defendant be sentenced to natural life, but indicated it had "no pleasure gained by a sentence that must be determined by this court today." The court agreed, noting it was sworn to follow the law and the law mandated a term of natural life. On all five counts of predatory criminal sexual assault, the court sentenced defendant to natural life.

¶ 59 This appeal followed.

¶ 60                                    II. ANALYSIS
¶ 61                    A. The Prosecutor's Remarks During Closing Argument
¶ 62        Defendant first argues the State improperly alleged defendant's body language, during his interrogation and testimony, indicated deceit. Defendant points to the prosecutor's comments directing the jury to watch defendant's hands during his interrogation and his manner in moving his hands. Defendant further points to the prosecutor's direction to watch the children's testimony and mannerisms. Defendant argues these comments, "human lie-detector argument[s]," injected improper considerations into the jury's prerogative to determine witness credibility. In support, defendant relies on two cases: *People v. Henderson*, 394 Ill. App. 3d 747, 749-50, 752, 915 N.E.2d 473, 475-77 (2009), and *United States v. Williams*, 133 F.3d 1048, 1052-53 (7th Cir. 1998).

¶ 63        The State begins by arguing defendant forfeited this argument by not objecting at trial, meaning defendant has the additional burden of proving the plain error doctrine applies. The State also argues the comments made by the prosecutor were based on reasonable inferences from the evidence, stating the jury saw defendant's conduct and demeanor and heard his testimony he was shocked. The jury could see defendant as he wiped his hands on his legs. The State further argues the prosecutor's comments were invited by defense counsel, who stated during opening statements the jury could see the children's videotaped statements to "evaluate whether they're scripted like the kids pushing out lines at their school play."

¶ 64        Regarding forfeiture, defendant asserts the State forfeited its forfeiture argument. Defendant points to the record as showing, during the hearing on the posttrial motions in which this issue was raised, the State did not assert defendant's forfeiture. *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 124, 18 N.E.3d 941.

¶ 65        We need not address forfeiture. The initial step in plain error analysis is to ascertain whether an error was made. *People v. Owens*, 372 Ill. App. 3d 616, 620, 874 N.E.2d 116, 118 (2007). If there is no error, there cannot be plain error. We find defendant has not established error.

¶ 66        During closing argument, prosecutors are granted wide latitude. *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007). Prosecutors breach that latitude when they express personal beliefs or opinions or invoke the State's Attorney's office's integrity, to vouch for a witness's credibility. *People v. Boling*, 2014 IL App (4th) 120634, ¶ 126, 8 N.E.3d 65. We view closing arguments in their entirety and consider the challenged remarks in context. *Id.* The question of whether a prosecutor's statements in closing argument necessitate a new trial is a legal question reviewed *de novo*. *Wheeler*, 226 Ill. 2d at 121, 871 N.E.2d at 744. Reversal is not warranted unless the improper remarks result in substantial prejudice to the defendant. *People v. Thompkins*, 121 Ill. 2d 401, 445, 521 N.E.2d 38, 57 (1988); see also *People v. Billups*, 318 Ill. App. 3d 948, 958-59, 742 N.E.2d 1261, 1270 (2001).

¶ 67        Defendant's argument is unconvincing. Defendant's two key cases, *Henderson* and *Williams*, involve situations where governmental law enforcement personnel at trial testified regarding the mannerisms and behavior of the defendants. Neither case involves improper prosecutor's remarks. For example, in *Henderson*, a detective testified extensively on his interrogation training and how behaviors indicate when an individual is being truthful. *Henderson*, 394 Ill. App. 3d at 749-50, 915 N.E.2d at 475-76. The detective testified " 'vague responses can be indicators of deception' " and then testified defendant gave vague responses. *Id.* at 750, 915 N.E.2d at 476. The detective testified regarding defense mechanisms he looked

for, including scratching the nose and sweating, and then stated defendant was sweating and sat in a defensive posture during tougher questions. *Id.* at 750-52, 915 N.E.2d at 476-77. The *Henderson* court found the admission of such testimony erroneous. *Id.* at 753, 915 N.E.2d at 478 ("We agree \*\*\* about the uselessness of this testimony, given that it amounts to nothing more than inadmissible opinion testimony by the officer that defendant's story was not true."). In *Williams*, a special agent testified the defendant, when informed he was under arrest, avoided eye contact and lowered his head. *Williams*, 133 F.3d at 1052-53. The Seventh Circuit observed the agent purported "to be a human lie detector" in observing the defendant's demeanor. *Id.* at 1053. The court found the agent's observations to be "improper characterizations of the defendant and useless in the determination of innocence or guilt, and in fact, they tend to prejudice the jury." *Id.*

¶ 68    Defendant cites one case in which prosecutorial remarks necessitated a new trial: *Boling*, 2014 IL App (4th) 120634, ¶ 125, 8 N.E.3d 65. *Boling* is, however, distinguishable. In *Boling*, this court considered a defendant's challenge to the following statements made during closing argument and rebuttal:

" 'We can believe [K.A.] when she says that [defendant] put his privates on her woo woo.

We can believe her when she says that [defendant] put his privates on her bottom, as in Count II.

And we can believe her when she says that he put his mouth on her woo woo.' " *Id.*
" 'So, I do think [K.A.'s] statements are credible. They are believable. They are honest.' " *Id.*

This court concluded the use of the term "we" did not express the prosecutor's opinion, but believed the term " 'I do think [K.A.'s] statements are credible' " improperly expressed the prosecutor's personal beliefs. *Id.* ¶¶ 126-27.

¶ 69    None of these cases establish the prosecutor here acted improperly. The prosecutor did not express personal beliefs, but pointed to defendant's own testimony of shock and asked the jury to look at defendant's actions, which it could see. The prosecutor did not tell the jury that a person who wipes their hands on their pants is guilty. The prosecutor did not weigh the credibility of the witnesses, which is in the jury's exclusive province (*id.* ¶ 139), but asked the jury to do so by what it observed.

¶ 70    This argument fails.

¶ 71                    B. The Admissibility of Other-Crimes Evidence

¶ 72    Defendant argues the trial court abused its discretion by admitting other-crimes evidence under section 115-7.3 of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/115-7.3(a)(1) (West 2010)) due to an inadequate foundation for that evidence. Defendant acknowledges other-crimes evidence in prosecutions for predatory criminal sexual assault of a child may be admissible, but he contends in these circumstances the trial court erred. Citing *People v. Donoho*, 204 Ill. 2d 159, 182, 788 N.E.2d 707, 721 (2003), defendant contends the only other-crimes evidence that is admissible is evidence of crimes committed *before* those charged. Defendant contends the State's evidence was vague on the timing of the alleged other crimes and may have included crimes occurring after the charged conduct, and the State presented no actual testimony on proximity of time and degree of factual similarity. In

addition, defendant contends the other-crimes evidence was so vague it placed him in the impossible position of accounting for his whereabouts on unspecified dates and times and not just the three dates charged. In support, defendant cites the Second District decision, *People v. Cardamone*, 381 Ill. App. 3d 462, 489, 885 N.E.2d 1159, 1180 (2008).

¶ 73 Defendant points to the following uncharged offenses alleged by A.H.: incident where (1) defendant accompanied her and her two sisters into a shed at their grandmother's house in Clinton and told the girls to put their mouths on his penis; (2) defendant took the three girls to a playground in Clinton and forced them to put their mouths on his penis; and (3) A.H. was playing a video game with defendant, where sex acts involving A.H.'s mouth and defendant's penis were triggered by events during the game. Defendant also emphasizes T.H.'s interview in which he stated defendant played with T.H.'s penis "5 or 3 times."

¶ 74 In general, evidence of other crimes is inadmissible to show propensity. See generally *People v. Smith*, 2015 IL App (4th) 130205, ¶ 21, 29 N.E.3d 674. Section 115-7.3 of the Procedure Code, however, provides an exception, permitting other-crimes evidence when the defendant is accused of predatory criminal sexual assault of a child. 725 ILCS 5/115-7.3(a)(1), (b) (West 2010). Such evidence is admissible and "may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2010). The section further states, "[i]n weighing the probative value of the evidence against undue prejudice to the defendant, the court *may* consider: (1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." (Emphasis added.) 725 ILCS 5/115-7.3(c) (West 2010). Other-crimes evidence, upon meeting the initial statutory requirements, " 'is admissible if it is relevant and its probative value is not substantially outweighed by its prejudicial effect.' " *Smith*, 2015 IL App (4th) 130205, ¶ 21, 129 N.E.3d 674 (quoting *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 38, 970 N.E.2d 72).

¶ 75 This court will not overturn a decision to admit other-crimes evidence absent an abuse of discretion. *Donoho*, 204 Ill. 2d at 182, 788 N.E.2d at 721. An abuse of discretion has occurred when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the position adopted by the trial court. *Id.*

¶ 76 Before addressing whether the trial court erred, it is necessary to address a number of defendant's suppositions. Defendant first alleges the trial court must make "specific findings as to each of these criteria on the record" before ruling on the admissibility of other-crimes evidence. There is no language in section 115-7.3(c) that requires specific findings. Section 115-7.3(c) specifies a trial court, in weighing the probative value of the evidence against undue prejudice, *may* consider the factors. 725 ILCS 5/115-7.3(c) (West 2010). Such language falls short of requiring specific findings.

¶ 77 In addition, defendant asserts *Donoho* stands for the conclusion only evidence of *prior* offenses is admissible. We disagree. In *Donoho*, the court considered the propriety of a trial court's decision to allow the admission of evidence of another crime committed 12 to 15 years before the charged offense. *Donoho*, 204 Ill. 2d at 184, 788 N.E.2d at 722. The court did not decide to limit section 115-7.3's application to "prior offenses." The term "prior offense" was in the discussion of the earlier conviction, not an express limitation of the rule's application. See, *e.g.*, *id.* at 182, 788 N.E.2d at 721 ("In addition, defendant pled guilty in 1983 to indecent liberties with a child, which is a *prior offense* about which evidence is potentially admissible under this section." (Emphasis added.)). Defendant cites the legislative history appearing in

*Donoho,* in which Senator Radogno, the sponsor of the bill, stated the bill " 'would allow the introduction of evidence of prior sex crimes into a trial of any of the sex offenses which are enumerated in the bill.' " *Id*. at 173, 788 N.E.2d at 716 (quoting 90th Ill. Gen. Assem., Senate Proceedings, Mar. 19, 1997, at 56-57 (statements of Senator Radogno)).

¶ 78　　We need not consider Senator Radogno's statements. In *Donoho,* the supreme court considered conflicting statements in section 115-7.3 to ascertain whether other-crimes evidence was admissible as to an accused's propensity to commit the enumerated sex offenses. *Id.* at 172, 788 N.E.2d at 716. The *Donoho* court found an ambiguity in this language and turned to legislative history to aid its interpretation. *Id.* at 173, 788 N.E.2d at 716. The term "prior" was not relevant to this determination.

¶ 79　　Here, in contrast, the issue is the meaning of the term "proximity in time" in section 115-7.3(c). 725 ILCS 5/115-7.3(c) (West 2010). The primary principle of statutory interpretation is to determine and give effect to the legislature's intent. *Paris v. Feder*, 179 Ill. 2d 173, 177, 688 N.E.2d 137, 139 (1997). The best evidence of that intent is the language of the statute itself. *Id*. We consider the statute as a whole, construing each provision in connection with every other section. *Id.* If the plain language evinces legislative intent, that intent prevails without resort to other interpretive aids. *Id.* Following these principles, there is no language within section 115-7.3 or surrounding sections that indicate the term "proximity in time" is intended to apply to only past offenses. The language is plain, indicating an intent that so long as the other crime is "proxim[ate] in time," it may be admissible to show propensity. We reject the invitation to read "prior" into this language.

¶ 80　　With these findings in mind, we turn to the record and find no abuse of discretion in the decision to allow testimony on the other crimes. Before ruling, the trial court considered lengthy arguments by the parties regarding the time frame and the specific content of the allegations. The record supports a conclusion the other crimes were "proxim[ate] in time." As noted in *Donoho*, even a time span of 12 to 15 years does not render other crimes inadmissible when other circumstances, such as factual similarities, justify admission. See *Donoho*, 204 Ill. 2d at 186, 788 N.E.2d at 723-24. Given the children's ages and the testimony regarding the locations of the offenses, the crimes could not have extended more than a couple of years. In addition, the similarities between the offenses are striking. All of the victims are younger siblings to whom defendant had access. The physical acts repeatedly performed were similar. Defendant's conduct in the other crimes was relevant to motive, knowledge, common design, identity, and intent. The trial court decided the probative value of the other-crimes evidence outweighed its prejudicial effect. That conclusion was not unreasonable. We note the court also instructed the jury such evidence would be admitted and the jury should consider it only for the limited purpose of identification, presence, design, or motive.

¶ 81　　*Cardamone* is distinguishable. In *Cardamone*, the uncharged other-crimes evidence that was admitted involved hundreds of sexual acts against 14 girls. See *Cardamone*, 381 Ill. App. 3d at 464, 885 N.E.2d at 1161. The trial lasted approximately two months and included more than 100 witnesses. *Id.* The court concluded no reasonable person would find the probative value of the other-crimes evidence was not outweighed by its prejudicial effect. *Id.* at 497, 885 N.E.2d at 1186. The court observed, however, some of the evidence was admissible, but noted "it is difficult to determine precisely where to draw the line." *Id.*

¶ 82　　We disagree defendant was placed in the same situation as the *Cardamone* defendant, who had to defend against "so many allegations of uncharged conduct" he would have to account

"for his whereabouts and behavior almost all day, every day, over a three-year period." *Id.* at 494, 885 N.E.2d at 1184. Defendant presented testimony by himself and others regarding the uncharged offenses, denying he was present in the shed, establishing he did not go to the playground, and contradicting the veracity of the children by the testimony of Br. L. and Bi. L.

¶ 83                    C. The Trial Court's Ruling on Br. L.'s Prior Consistent Statement

¶ 84    Defendant next argues the trial court erred by denying his request to admit the video interview of Br. L. to rebut the State's implication Br. L. was testifying falsely to protect her brother. Defendant argues the record establishes when Detective Burns interviewed Br. L., she was unaware of the reason for the interview and of the investigation into defendant's actions as defendant had not been questioned or arrested until after Br. L.'s interview. Defendant maintains Br. L. thus had no reason to fabricate statements exonerating her brother when she first spoke to Detective Burns. According to defendant, this failure deprived him of his right to present a full defense.

¶ 85    In general, statements made before trial are inadmissible for the purpose of corroborating trial testimony. *People v. Cuadrado*, 214 Ill. 2d 79, 90, 824 N.E.2d 214, 221 (2005). Prior consistent statements are not admissible simply because a witness has been discredited or impeached. *People v. Mullen*, 313 Ill. App. 3d 718, 730, 730 N.E.2d 545, 555 (2000). An exception to the general rule, the exception invoked by defendant, allows admission of prior consistent statements when it is suggested the witness "recently fabricated the testimony or had a motive to testify falsely, and the prior statement was made before the motive to fabricate arose." *Cuadrado*, 214 Ill. 2d at 90, 824 N.E.2d at 221. The party seeking admission of the prior consistent statement carries the burden of proving the prior statement predated the alleged recent fabrication or the existence of the motive to testify falsely. *People v. Richardson*, 348 Ill. App. 3d 796, 802, 809 N.E.2d 141, 146-47 (2004). The decision whether to admit evidence is within the sound discretion of the trial court. *People v. Becker*, 239 Ill. 2d 215, 234, 940 N.E.2d 1131, 1142 (2010). We will not reverse a trial court's decision whether to admit or deny evidence absent an abuse of that discretion. See *id.*

¶ 86    This question is a close one. Defendant has established the prior consistent statement predated Br. L.'s knowledge defendant was suspected of wrongdoing and in danger of imprisonment for his actions. Thus, the State's implication Br. L. was testifying in a manner to help her brother return home was contradicted in some respect by her statement made before defendant's arrest and confinement. On the other hand, one could argue Br. L.'s motive to protect her brother may have existed at the time of the interview, when she was asked if anything happened in a shed with defendant or at a playground.

¶ 87    The trial court, in ruling on defendant's request, recognized the closeness of this question. In fact, the court ruled, in part, in defendant's favor. While finding it improper to replay Br. L.'s entire interview for the jury for the sole purpose of discrediting an implied motive to lie, the court found it sufficient for Br. L. to testify what she told Detective Burns during her interview was the same as what she told the jury:

> "Evidence of a prior consistent statement is ordinarily not admissible to refute a claim of bias either. However, a prior consistent statement can be admissible to rebut a charge or inference that the witness's motivated to testify falsely, so long as the witness told the same story before the motive came into existence or the witness's testimony is of recent fabrication, so long as the witness told the same story before the time of the

- 15 -

alleged fabrication. So, we don't need to, nor is it appropriate from the Court's perspective, to go ahead and display a video or an interview that occurred a year ago to go ahead and go through each and every statement that she's already testified to. However, since there could or might be an inference of fabrication, an inference based upon, in essence, the bias that was established or attempted to be established relative to brother, who she resides with, being aware that, that being of certain things, if the Defendant wanted to go ahead and ask whether or not what she testified on the stand today is consistent with that she told Detective Burns in the past. I think that's permissible without getting into specifics."

¶ 88    Defendant has not established this ruling was an abuse of discretion. With Br. L.'s testimony establishing her statements were the same and the evidence in the record showing Br. L. was interviewed before the witness arguably knew her brother was in danger of prosecution, the State's inference of bias was undermined. Defendant was allowed to show this, and the jury heard this. Defendant has not established error.

¶ 89              D. The Constitutionality of Defendant's Natural Life Sentences

¶ 90    Defendant argues his mandatory natural life sentences on all five counts violate the eighth amendment, the federal due process clause, and the proportionate penalties clause of the Illinois Constitution. Regarding his eighth amendment challenge, defendant cites *Graham v. Florida*, 560 U.S. 48, 82 (2010), as establishing a state may not impose a sentence of life without parole on juvenile offenders who did not commit homicide.

¶ 91    In *Graham*, the defendant, 34 days before his eighteenth birthday, participated in an armed robbery, for which the trial court imposed a sentence of life without parole. *Id.* at 55-57. The First District Court of Appeal found the defendant's sentence not grossly disproportionate to his offenses and affirmed. *Id.* at 58. After the Florida Supreme Court denied review, the United States Supreme Court granted *certiorari* to consider whether a sentence of life without parole for juvenile offenders of nonhomicide crimes constitutes "cruel and unusual punishment." *Id.*

¶ 92    The *Graham* Court called life without parole " 'the second most severe penalty permitted by law.' " *Id.* at 69 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring, joined by O'Connor and Souter, JJ.)). The sentence "alters the offender's life by a forfeiture that is irrevocable," depriving the offender "of the most basic liberties without giving hope of restoration." *Id.* at 69-70. The Court concluded such a sentence is especially harsh for a juvenile, serving more years and a larger percentage of his life in prison than an adult offender. *Id.* at 70. The Court found the penological justifications for life without parole–retribution, deterrence, incapacitation, and rehabilitation–did not support imposing such a severe penalty for juveniles. *Id.* at 71-74. The Court expressly found juveniles, who lack maturity and have an underdeveloped sense of responsibility that often leads to ill-considered actions and decisions, are less likely to consider possible punishment before undertaking an endeavor. *Id.* at 72. The Court further found incapacitation did not justify life without parole for juveniles, as such a finding assumes the juvenile offender will always be a danger to society and is incorrigible. *Id.* at 72-73 (" 'It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005))). As to the goal of rehabilitation, the Court found the life without parole penalty "forswears altogether the rehabilitative idea." *Id.* at 74.

¶ 93     The *Graham* Court acknowledged states are "not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," but found states must give such defendants "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. The Court determined the eighth amendment "prohibit[s] States from making the judgment at the outset that [juvenile offenders of nonhomicide crimes] never will be fit to reenter society." *Id.*

¶ 94     In this case, defendant's sentence of natural life was imposed according to section 12-14.1(b)(1.2) of the Criminal Code (720 ILCS 5/12-14.1(b)(1.2) (West 2010)). This section leaves the trial court with no discretion and mandates sentences of life without parole for individuals convicted of predatory criminal sexual assault of a child committed against two or more persons: "A person convicted of predatory criminal sexual assault of a child committed against 2 or more persons regardless of whether the offenses occurred as the result of the same act or of several related or unrelated acts shall be sentenced to a term of natural life imprisonment." *Id.*

¶ 95     These sentences were imposed on all counts, even on those counts committed when defendant was a juvenile. Counts I through III, involving A.H., T.H., and J.H, occurred on October 19, 2010, approximately six months before defendant's eighteenth birthday. While the convictions of predatory criminal sexual assault involving two or more victims is satisfied (see *id.*), *Graham* necessitates a reversal of those sentences and remand for resentencing.

¶ 96     Two natural life sentences, or life without parole sentences, were imposed on offenses defendant committed after his eighteenth birthday. Counts IV and V allege offenses in June 2011 and October or November 2011. These offenses on their own do not trigger the natural life sentence mandated by section 12-14.1(b)(1.2), as they both involve only one victim, A.H.

¶ 97     The State contends these sentences may stand on two grounds. First, the State cites *Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2471 (2012), as establishing the eighth amendment only bans mandatory life sentences for juveniles and permitting courts to impose such a sentence if considerations merit it. Second, the State argues defendant's juvenile convictions for predatory criminal sexual assault must be counted for purposes of section 12-14.1(b)(1.2) (720 ILCS 5/12-14.1(b)(1.2) (West 2010)). Because those convictions involved different victims, the threshold requirement of two or more victims is met and defendant's sentence on those counts is proper.

¶ 98     The State's reliance on *Miller* is misplaced. *Miller* involved two 14-year-olds convicted of murder. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460. This fact alone distinguishes *Miller*'s application to this case. *Graham*'s holding applies to juveniles convicted of nonhomicide offenses. *Graham*, 560 U.S. at 75. In addition, the *Miller* Court did not undermine the decision in *Graham*, but relied on *Graham*'s analysis regarding a juvenile's " 'lessened culpability' " and increased " 'capacity for change,' " when it determined *mandatory* life without parole for those under 18–*all* juvenile offenders regardless of the committed offense–violates the eighth amendment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460 (quoting *Graham*, 560 U.S. at 68, 74).

¶ 99     As to its second argument this court must consider defendant's convictions for counts I and III as triggering the mandatory life sentence for counts IV and V, the State relies on three cases other than *Miller*: *People v. Lawson*, 2015 IL App (1st) 120751, 29 N.E.3d 464, *People v. Sims*, 167 Ill. 2d 483, 658 N.E.2d 413 (1995), and *People v. Huddleston*, 212 Ill. 2d 107, 816 N.E.2d 322 (2004).

¶ 100    The State's cases are unconvincing. In *Lawson*, the defendant received a natural life sentence based on his commission of his third Class X felony, pursuant to section 33B-1(a)(e) of the Criminal Code (720 ILCS 5/33B-1(a)(e) (West 2006)). The defendant argued his sentence was unconstitutional because one of the two prior Class X convictions (a 1998 conviction for armed robbery) occurred when he was 17 years old. *Lawson*, 2015 IL App (1st) 120751, ¶ 44, 29 N.E.3d 464. The defendant cited *Graham* and its language " 'criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.' " *Id.* ¶ 47 (quoting *Graham*, 560 U.S. at 76). The First District found defendant's argument unconvincing and found the sentence "in this case" not unconstitutional. *Id.* ¶ 53. The court observed "[d]efendant's adjudication as an armed habitual offender, of which he had fair and ample warning, punished him for the new and separate crime he committed in 2006 as an adult after having already been convicted of two prior Class X felonies." *Id.*

¶ 101    While in *Lawson*, approximately eight years and two convictions separated the juvenile offense from the last offense, two to seven months and no charges or convictions spanned the time between the offenses triggering section 12-14.1(b)(1.2). Defendant, unlike the defendant in *Lawson*, had no "fair and ample warning" (*id.*) or time to rehabilitate before the juvenile offense triggered a natural life sentence.

¶ 102    The State's other two cases predate *Graham* and are factually distinguishable. *Huddleston* involves a 36-year-old defendant who committed two acts of predatory criminal sexual assault of a child against two children. *Huddleston*, 212 Ill. 2d at 111, 127, 816 N.E.2d at 334, 325. Both acts that triggered the application of section 12-14.1(b)(1.2) pertaining to mandatory life sentences occurred well into the *Huddleston* defendant's adulthood. In *Sims*, the defendant argued his 1975 murder conviction for an offense he committed when he was 17 years old could not constitutionally be used to render him eligible for the death penalty for an offense he committed 13 years later. *Sims*, 167 Ill. 2d at 490, 521-22, 658 N.E.2d at 416-17, 431. Unlike here, the *Sims* defendant had "fair and ample" *Lawson*, 2015 IL App (1st) 120751, ¶ 53, 29 N.E.3d 464) warning and time to rehabilitate.

¶ 103    Under the reasoning of *Graham*, we find the mandatory natural life sentences imposed on counts IV and V violate the prohibition against cruel and unusual punishment. *Graham* prohibits natural life sentences for juveniles who commit nonhomicide offenses. It is contrary to the analysis in *Graham* to permit the conduct for which a defendant could not receive a life sentence to trigger a life sentence for a second offense, committed after defendant's eighteenth birthday.

¶ 104    Having found defendant's natural life sentences violate the eighth amendment, we need not determine whether they are otherwise unconstitutional.

¶ 105                              III. CONCLUSION

¶ 106    We affirm the trial court's judgment as to defendant's convictions, we reverse his natural life sentences, and we remand for resentencing. As part of our judgment, we grant the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002 (West 2014).

¶ 107    Affirmed in part and reversed in part; cause remanded.